Statement of the Case.
MONROE, C. J.
William Dwyer, deceased husband of Margaret McLain Dwyer, deceas *377 ed, acquired during their marriage and as community property two lots of ground in a thinly settled part of this city. He died in April, 1882, leaving his widow and four minor children, viz. Alice (now widow Cohen), aged 18 years, Margaret (now Mrs. John Lund), aged 11 years, Timothy, aged 10 years, and Patrick, aged perhaps, 6 years, and leaving no other visible estate than his interest in the above-mentioned lots and a mule and dray, with which last mentioned he had earned his livelihood. His succession was opened by the public administrator, who, in January, 1883, obtained an order of court for the sale of the lots, at auction, and they were so sold, with some improvements which had been put on them, consisting of a dwelling house, outbuildings, and fencing, and were bought in by the widow. How she maintained her children and herself during the, say, 8 or 9 years that followed is not clearly shown, but the impression that we gather is that the mule was the main stay; that she perhaps converted the dray into a dump cart, and, taking out a license, did hauling for the city, or for some plant that was established in the neighborhood, and perhaps added another mule and cart. Timothy, being 10 years old when his father died, might, perhaps, have driven a cart, but he testifies that he never worked for his mother as an employe in his life. Patrick testifies that he began handling the mule when he was so small that he had to stand on a box in order to put on the harness. The girls no doubt assisted about the house, but there is nothing in the record on that subject. Timothy says that when he was a small boy he was employed in a shoe factory, but for how long or at what wages he does not say, that he then worked in a foundry for a few months at $2.50 a week then in another foundry for a year at $1.75 a day, then in a wholesale store for a year at $45 a month and again at the. same place, after a short interval, for a few months; but he testifies that he spent a good part of his earnings, and saved “some,” but, being asked how much he saved and where he kept his savings, he was unable to remember anything at all as to those matters, and our conclusion is that when in, say, 1890 or 1891 he quit working for the wholesale house he had saved nothing, and it does not appear that he had up to that time contributed anything to the support of the family. In 1891 he attained his eighteenth year, was without means, and could neither read nor write, but, as we infer, was possessed of both energy and intelligence, and was anxious to get into some profitable employment. His mother was also illiterate, but. from what has already been stated it is evident that she also was intelligent and energetic, for she had bought in the property in 1882, had preserved it free of mortgage, and had kept her family together, and the two girls, about that time, or, within a few years, appear to have married respectably — Mrs. Lund, to a husband who provided, and still provides, a home for her; Mrs. Cohen, to a husband who took care of her for four years, when he died, and she returned to the family home, and has since remained there. Timothy, as we have said, in 1890 or 1891 left the employ of the wholesale house, and' though we are satisfied that he did so with a view of bettering his condition, we are also satisfied that he had no capital. As a matter of fact, a dairy was started in 1S91 with the purchase of one cow (and, it may as well be here stated, it was kept in operation until July, 1903, when it was sold for $500). Timothy testifies that it was he who started the dairy, and that his mother never owned it. Mrs. Lund and Patrick testify that the dairy was their mother’s enterprise, and that whatever Timothy did in connection with it was done as her representative. As time wore on, the dump cart or drayage business was de *379 veloped or revived, becoming an affair of, perhaps, a half dozen mules and carts, and the witnesses, respectively, testify to the same effect in regard to the relations of Mrs. Dwyer and Timothy to that business; that is to say, Timothy testifies that it was all his, and that, from the earnings of the two businesses, but more particularly of the dump cart business, he paid the family expenses, and by 1908 had saved $3,400 in actual cash, which he kept in a tin box in the bottom drawer of an old dresser at the family home and with part of which he in that year and the year or two following reconstructed or repaired the family dwelling house, outhouses, and fences, built a barn or stable' on the place, and made other expenditures. The evidence, taken as a whole, unquestionably corroborates Timothy’s testimony to the extent of showing that to the outside world he appeared to be the head of at least the dump cart business; that it was he who almost without exception made the contracts for hauling and was known and recognized as the person to whom checks were to be drawn in payment for such work and whose name appeared on pay rolls where there were no contracts and the hauling was paid for by the load. It is shown that it was he also who generally bought the cows that were needed from time to time for the dairy, but it is not so clear that his mother did not now and then participate in those transactions. We think it clearly established that from the time the two businesses got well under way (though that time is not definitely fixed), Timothy, from the revenues which came into his hands, supplied his mother with by far the greater part of the money that was used for the maintenance of the family, the payment of taxes, etc. (and the family consisted of Mrs. Dwyer, Mrs. Cohen, Mrs. Cohen’s daughter and young son, Patrick, Benny Skardo, a boy who grew to be a young man, and Timothy, himself), and it is admitted that he actually paid out, for reconstruction and repairs, etc., the amounts for the recovery of which he brings this suit.
On the other hand, going back to 1891, when the dairy was started, we must remember that Timothy was but 19 years old, had up to that time turned from one employment to another and had accumulated no capital; that Mrs. Dwyer was a capable and thrifty woman, who owned, and had succeeded in preserving under no doubt desperate conditions, the property upon which she lived, and in keeping her family there sheltered, fed, and clothed, and we can very well understand that Timothy did not start the dairy on her place without consulting her, and can very well imagine that as she was to do and did the milking, or part of it, the suggestion that a dairy should be started may have been made by her, and that as Patrick was to drive and did drive the milk wagon, it was a suggestion that included the family, as beneficiaries as well as operatives. It is not shown that Timothy did anything in connection with the dairy, except buy cows, and, though a vendor from whom most of them were bought testifies that he sold them to Timothy, there is other testimony to the effect that he called on Mrs. Dwyer at times when payments were due him, from which we infer that he looked to her as well as to Timothy, and perhaps more so, as she had property and Timothy had none. Beyond that, it is shown that as far back as the assessment rolls are produced (the year 1902), and, it is admitted, as far back as 1897, and as far forward as there was any dairy, the permits and assessments were in the name of Mrs. Dwyer, and that at least from 1897 the mules and carts were assessed and the licenses for the carts were issued to her; that on several occasions while the dairy was in operation she was arrested and fined for allowing her cows to roam and for selling adulterated milk, and, as we understand, the per *381 mits and licenses were issued on affidavits that she owned the cows and mules.
Timothy attempts to explain those matters by saying that a negro had obtained a judgment against him for $12, which he did not think he owed and did not intend to pay, and hence that his business and property appeared in the name of his mother; but the judgment in question was not rendered until 1897, so that the explanation does not explain why the business and property should have appeared in the name of his mother during the six preceding years, as we assume was the case, because, though he testifies somewhat uncertainly, as we think, that licenses were, at one time, taken out in his name, he produces no assessment rolls or other record evidence to support that testimony. Another circumstance in the case is that during some period in the progress of the events here narrated there were issued business cards hearing the legend “Dwyer Brothers,” and, at a later date, reading:
“T. & P. Dwyer.
“323 South Broad Street.
“Lets filled to grade. Carts to hire. “All orders promptly attended to.”
Which circumstance plaintiff explains by saying that his mother desired that Patrick should be recognized in that way, and that he yielded to her wishes in order to keep peace in the family. Patrick says that as the business was that of the mother, conducted by her two sons, it was thought proper that it should be conducted under that title, and that the collections made by him were turned over to his mother, save such amounts as he retained for his personal use. Still another circumstance is that in 1893 Mrs. Dwyer bought an additional lot in the same square with, and (as we infer) adjacent to, the other two, although, according to the testimony of Timothy, she had no business after the death of his father and had no property except the real estate, and no revenue, except $6 a month from one lot, and after 1890 a pension of $8, and later $12 a month. And yet another circumstance is that Mrs. Dwyer, at one time during the period of the dairy and dump cart business, mortgaged her property in order to obtain $200 wherewith to buy two mules, which she would hardly have done unless she had needed the mules for business purposes.
The “contents of the dairy” were sold by Timothy Pwyer on July 13, 1904, for $500 cash, and included 13 milch cows, 1 bay horse, the good will of the business, and other movable property, and Patrick Dwyer testifies that the money was turned over by Timothy to his mother; but, as he also testified at first, that it consisted of two $200 bills and one $100 bill, and as he is the only person of whom we have yet heard who has seen a $200 bill, his testimony may be considered as in some need of corroboration, even though he afterwards corrected it by saying that there were five $100 bills.
Mrs. Dwyer died in February, 1914; in May of that year her daughter, Mrs. Lund, was appointed administratrix of her estate, having previously filed an inventory showing a total appraisement of $3,591, including 3 dump carts (old), 11 sets of harness (old), and 4 mules, the whole appraised at $178.50, and real estate appraised at $3,350. There is a notation on the inventory to the effect that the carts, mules, and harness were claimed by Timothy Dwyer as his property, and it was stated in argument and not denied that the claim so noted was asserted by way of a rule that the judgment dismissing the rule was affirmed by the Court of Appeal, and that an application for a review of the judgment of affirmance was denied by this court. This suit was instituted in July following the appointment of the administratrix, and plaintiff here demands reimbursement of moneys expended by him as follows:

*383

He alleges in Ms petition that his mother and brother resided in the dwelling house after the death of his father and np to September, 1908; that all of the heirs then believed that the property (referring to the lots which had belonged to the community) was owned by them, as heirs of his father, in indivisión with their mother; and that it was agreed between his mother, his sister (Mrs. Cohen) his brother, and himself that the dwelling house should he reconstructed “under his direction and supervision,” but he admits in his testimony that neither Mrs. Lund nor his brother were consulted by him in the matter. He also alleges in Ms petition that at the request of Ms mother he caused the bam to be erected on the lot which she had acquired after the death of his father. He further testifies that he never spoke to his mother about reimbursing the moneys expended, except on one occasion, which was at their New Year’s dinner in 1914 (less than two months before his mother died), and that his mother then said that whenever he got ready she would “raise a mortgage” and give him what she owed him, and that the conversation went no further, though he had spoken to her, because he then wanted to buy some lots in the parish of St. Bernard. His testimony on that subject is corroborated to some extent by his niece', the daughter of Mrs. Cohen, but by no one else, though it is fair to suppose that other members of the family were present at the dinner on New Year’s Day.
The judge a quo gave judgment for $62.78, being the aggregate amount of the last three
items of plaintiff’s claim, which were paid after the death of Mrs. Dwyer, and rejected the demand for the balance.
Plaintiff alone has appealed, and defendant has not asked for any amendment of the judgment.
Opinion.
The learned counsel for plaintiff have devoted almost their entire brief to a discussion of the question of what the defendant must be taken to have admitted and denied by reason of the manner in which the different paragraphs of the petition have been dealt with in the answer, and they conclude that defendant, as administratrix, has admitted herself out of court, and that plaintiff is entitled to judgment as prayed for. But we do not find the situation to be quite so hopeless for the defense.
There was no attempt in the district court to take judgment on the petition and answer, counsel for plaintiff having merely objected to certain testimony offered by defendant, on the ground that it was irrelevant and inadmissible under the pleadings, as regulated by Act 157 of 1912, amended by Act 300 of 1914. The objections were addressed first, to a line of interrogatories, the apparent purpose of which was to show that plaintiff had not been in positions to have accumulated means of Ms own sufficient to make the expenditures for which he claims reimbursement, and were based upon the failure of defendant to deny specifically the allegations of paragraphs 13, 14, 16, and 17 “of the petition, which, with paragraphs” 11 and 12, read as follows:
“1. That Margaret Dwyer Lund, * * * administratrix, * * * is * * * indebted to petitioner in the full sum of $2,161.65, together with legal interest thereon, * * * all of which is due, owing, and unpaid, for this, to wit: * * #
“11. That petitioner, Ms mother, and brother *385 were residing in said house after the death of their father up to the month of September, 1908, when it was agreed - between them and the said Alice Dwyer Cohen that said house and the fences around said lot should be reconstructed and rebuilt, under the direction and supervision of petitioner.
“12. That the cost and expense of such reconstruction and rebuilding and which was necessary and -reasonable was $1,402.98, as will more fully appear by * * * detailed statement * * * annexed. * * *
“13. That the several items as set forth * * * were ordered * * * . used in such construction, and paid for by petitioner, * * * and the same is still due and owing petitioner by said succession and administratrix, together with legal interest thereon from the dates of said respective payments.
“14. That petitioner paid for paving in front of the property * * * and expenses of a nurse during the last illness of his mother, and for her funeral services the sum of $153.44, as * * * shown by * * * statement, * * * all of which is clue and owing him by said succession and administratrix. * * *
“16. That in September, 1908, at the request of petitioner’s said mother, then the owner of said lot of ground, lastly described, petitioner caused to be erected a barn, at a cost of $605.23, as will more fully appear by * * * statement. * * *
“17. That the several items on Said statement were ordered by petitioner, used in the construction of said house, and paid for by petitioner, and he has never been repaid therefor, or for any part thereof, and the sum is still due and owing petitioner by said succession and administratrix, with legal interest. * * * ”
The answer (1) denies that plaintiff is a creditor of the succession in the amount herein claimed by Mm, or in any. amount whatever; (2) avers that plaintiff’s claim is stale and long withheld from presentation, plaintiff having never presented it to deceased during her lifetime; (3) avers that said claim and the items composing it are prescribed by the prescription of three years, which prescription respondent specially pleads in bar and extinguishment thereof.
The objections were overruled by the trial judge, on the ground:
“That the denial of any money liability by the succession to plaintiff is, in the opinion of the court, tantamount to a denial of every item comprising his claim.”
[1] It may be remarked, in this connection, that we find in the record a specific admission on behalf of defendant to the effect that, if the various persons and corporations named in the statements C and D annexed to the petition were called as witnesses, they would testify that plaintiff, in his own name, purchased the articles of merchandise, employed the persons to do the work, at the prices and on the dates and in the amounts, and paid them said prices, all as set forth in said statements, and that the work was done in the reconstruction and repair of the dwelling house, outbuildings, and fences and in the building of the stable on the property of the deceased as alleged in the petition. And as counsel for plaintiff offered no evidence for the establishment of the facts thus admitted, it is evident that the admissions were accepted by them and operated as a waiver on behalf of plaintiff of any rule or right to take judgment on the petition and answer. But the proposition that because of the admission of certain facts, alleged in a petition the defendant is necessarily indebted to the plaintiff in certain sums of money, alleged to be due by reason of such facts, involves a non sequitur, since the allegation of indebtedness is merely a statement of the pleader’s conclusion as to the law, as applied to the facts so admitted, and it may be well or ill founded, as the court may determine on the trial. In this case plaintiff alleges that his mother, his sister (Mrs. Cohen), and his brother agreed that the dwelling and fences should he reconstructed, under his “direction and supervision,” and that his mother requested him to build the barn, but he does not allege that they agreed to advance or reimburse the money required for such reconstruction and building, and it does not necessarily follow that they incurred any such obligation, any more than it would follow, from an agreement between a landlord and tenant for some work of reconstruction or building on the leased premises, that the landlord or the tenant (the one rather than the other) was necessarily to bear the ex *387 pense, or any more than it would follow that a mother would be liable for the price of a raincoat which, believing that he needs it, she requests her son (a grown man, engaged in business) to buy. Whether the parties to the alleged agreement and request (other than plaintiff) thereby incurred a pecuniary obligation was to be determined by all the considerations that entered into the agreement and request, and not by the bare facts, as alleged, that there was such an agreement and request, and those considerations were disclosed on the trial of the case by the testimony and cross-examination of plaintiff himself and his witnesses, and the testimony offered by defendant, which, as we think, shows that the relations between decedent, Mrs. Dwyer, and the plaintiff were such that she had the right to expect that the expense of reconstruction and building in question would be defrayed by plaintiff as a matter of both obligation and interest on his part, and from a fund which was common to them for those purposes.
It is quite likely that after plaintiff had acquired the rather dominant position that he no doubt did acquire in the business (or, at least, in the draying business) which his mother and he, or he and his mother, initiated, and had made a success of it, the idea grew upon him that it was he alone who had done it all, and that it was all his, but we find nothing to warrant the belief that his mother ever considered that her contributions, consisting of the premises upon which the businesses were conducted, her work in milking the cows, and her experience in the drayage business, before and after her husband’s death, before plaintiff was born and afterwards until he attained the age of 19, were all to count for nothing, and that she was to have neither interest nor voice in the matters in which she and other members of her family, still living at home, were so deeply concerned. The various circumstances which have been narrated plainly indicate that it was not so understood by her or by plaintiff, and perhaps none more strongly than that, though plaintiff was utterly opposed to any business association with his brother, he consented, at his mother’s request, that business cards should be issued, showing that he and his brother were so associated; and, in our opinion, that association, based as it was upon no definite terms of agreement, was typical of the relation which subsisted, so far as the business that was carried on was concerned, between plaintiff and his mother and the other members of the family. In other words, the idea, as we conceive it, was that the business to which the home premises were devoted was to furnish a maintenance for the family that lived in the home, and, among other things, was to keep the dwelling house from falling to pieces and leaving the inmates without a roof over their heads. Beyond which it was no doubt expected that the greater advantage and profit should inure to the plaintiff. When, therefore, the house became so dilapidated as to be dangerous to live in, it is not surprising that Mrs. Dwyer and Mrs. Cohen, who were living there, agreed that it should be reconstructed, as, no doubt, Mrs. Lund and Patrick would have agreed if they had been consulted; but that Mrs. Dwyer intended thereby to incur any pecuniary obligation to plaintiff appears to us highly improbable.
Plaintiff does not pretend to have suggested any such thing at the time, but says that his mother always knew that she owed him, and that nearly six years afterwards, in the course of conversation at the family New Tear’s dinner, he mentioned it because he was then going' back into the dairy business, and thought of buying some lots in the parish of St. Bernard, and that she said “whenever [he] I got ready, she would raise a mortgage and give [him] me what she owed [him] me,” after which nothing more was said or done *389 in the matter for the reason that his mother died during the following month of February. He was asked, “That was the only time you ever asked her?” and his reply was: “Yes, sir. I didn’t need to ask her.” At another time he had testified (on the trial of the rule taken by him to be declared the owner of the mules, carts, and harness, which testimony was offered in this case) as follows:
“Q. Had you any more assets or financial standing than your mother had? A. Me? Q. Yes. A. I have a mighty good name. Q. I say when you began to make these purchases? A. Yes, sir; always had a good name, from a small boy. Q. Didn’t your mother have also? A. I don’t know; she never did invest for me; I have asked her often; she said ‘No.’ Q. Never invested for you? A. No, sir; I often asked her to come to my rescue, in different times, and she wouldn’t. Q. How could your mother come to your rescue when you say you were supporting her? A. Well, she owned these properties, and many a time I needed a bond.”
Plaintiff’s niece, upon whom he relies as corroborating his testimony concerning the conversation at the New Year’s dinner, goes considerably farther than plaintiff himself, and says that he not only made a peremptory demand for his money on that occasion, but that he had frequently asked for it on previous occasions.
Thus we find the following in her examination in chief:
“Q. When was that conversation? A. The last that I .remember was New Year’s Day, just before she died. Q. Where was that conversation? A. In our kitchen at the dinner table. Q. Can you state the conversation? (Objection on ruling.) A. Yes, sir. Q. State it. A. There were some lots to be sold in Gentilly Iioad, by Donaldson, St. Bernard parish, and they were to be sold for $75 apiece, and on looking over the paper I read it out, and my Uncle Tim said he would move down there to start a dairy, and he said he wanted mouiy, and, turning to my grandmother, he said, ‘Now, old lady, you settle up.’ She said, ‘The only way I can settle up is to mortgage the place,’ and he said he didn’t care how she got it, he wanted his money, and we all laughed. A few days after that she had me to count up the amount which amounted to more than $2,100. And that was all that was said about the affair.”
On cross-examination:
“Q. You say it had been talked over before, several times; how did it come to be talked over? A. On several occasions he asked for his money. * * * Q. Why did your uncle have to ask her so many times for his money? A. Well, because he would ask and she would never say any more about it” (than that the only way she could give it was to “raise a mortgage, because she had no money”). “Another time he would bring it dp again and ask her again. Q. Did she refuse to pay it? A. No, sir; she never did. * * * Q. You were how old in 1908? A. Thirteen years old.”
[2] As will be seen, the testimony of the young lady is quite at variance with that of her uncle, and the testimony of both falls short, particularly in view of that which tends in the contrary direction, of showing any specific acknowledgment by the decedent that she owed plaintiff any money whatever. The language attributed to her might, as appropriately, have been used in denying, as plaintiff testifies she had frequently denied, his requests that she come to his rescue, or sign his bond, whereas the law applicable to such cases contemplates, as we think, that the testimony should be clear, positive, and convincing, showing something in the nature of a specific acknowledgment of a specific debt, and the more improbable seems the debt the clearer and more specific should be the testimony.
We may add that we find it difficult to see how it can be said in one breath that Mrs. Dwyer had no business, and in the next that she requested plaintiff to build her a bam, though it is easy to understand that, if she considered that she was a party in interest in the drayage business, she might have made such a request, or, even if she considered that the business belonged to plaintiff, that she might have made a request of that kind from a motherly interest in his affairs and a humane interest in his mules. Save upon one or the other of the hypotheses thus mentioned, we find nothing in the record to warrant the belief that she had any reason whatever *391 for requesting plaintiff to build a barn upon her lot at her expense, nor can we conceive why plaintiff should have been willing to build it. Our conclusion, however, is that the reconstruction of the dwelling and the fences and the building of the barn were regarded by Mrs. Dwyer and those of her family who were living with her (save, perhaps, plaintiff, who kept his views upon the subject to himself) as necessary or legitimate expenses of the business to the purposes of which the use of the premises, and the services to some extent, of the inmates, were contributed, and were not understood by them as creating any debt against them or the properties, and that it does not now lie in the mouth of the plaintiff to assert the contrary. The present demand, if not prescribed, is stale. And the same may be said of the money expended in the part payment of the paving bills, and might, perhaps, have been said of the balance due at the time of Mrs. Dwyer’s death, as to which, however, the judgment appealed from is now final, as it is with respect to the other Items making up the amount thereby awarded to the plaintiff, which judgment, for the reasons thus assigned, is
Affirmed.
SOMMERVILLE, X, takes no part.