## WHELAN v. FIRST NAT. BANK OF MAYFIELD, KY.

### No. 5818.

Circuit Court of Appeals, Sixth Circuit.

March 18, 1932.

L. W. Mason, of Tulsa, Okl. (W. M. Leise, of Tulsa, Okl., on the brief), for appellant.

Bunk Gardner, of Mayfield, Ky. (J. W. McDonald, of Mayfield, Ky., on the brief), for appellee.

Before MOORMAN, HICKS, and HICKENLOOPER, Circuit Judges.

MOORMAN, Circuit Judge.

This is a suit against the administrator of the estate of T. H. McGuire to collect the benefits of an express parol trust. The bill alleged in substance that plaintiff entered into a trust agreement with McGuire October 20, 1914, by the terms of which she made him her trustee to hold, invest, and reinvest for her benefit $4,200 which she delivered to him at that time; that subsequently, December 14, 1917, she entered into another agreement with him of the same import and delivered to him for investment and reinvestment the sum of $3,500; that McGuire accepted both sums and agreed to hold and invest the money so delivered to him and to return it to her on demand, with interest, earnings, and accumulations. It further alleged that McGuire invested the money in properties and securities, taking title thereto in his own name and holding such titles in his own name at the time of his death; that the investments which he made were profitable and increased in value until they were worth at the time of his death $15,400. Judgment was asked for that amount. Answer was filed by the administrator denying all material averments of the bill, and on the hearing of the case upon proofs in the lower court judgment was rendered for defendant.

Defendant insisted below and urges here that the nature of plaintiff's claim is such that she has no right to bring or prosecute suit thereon until she has first filed proof of. her claim with the administrator as provided by sections 3870 and 3872 of Kentucky Statutes. We pass the question and consider the issues of fact presented in the pleadings. Plaintiff testified to many circumstances bearing more or less upon those issues. Much of her testimony was objected to by defendant and excluded by the court. We

are of opinion that practically all of it should have been excluded under section 606 of the Kentucky Civil Code of Practice. Treating it, however, as admissible, we find that it contains little of probative value.

The original bill did not mention any memorandum of the express parol trust alleged, but in response to appropriate motions of the defendant the plaintiff finally alleged and offered evidence tending to show that at the time the two sums of money were delivered to McGuire he executed and delivered to her written receipts therefor. It is claimed in her behalf that these receipts were misplaced or destroyed by McGuire, to whom she re-delivered them in 1918 for safe-keeping. Not being able to produce them, she offered in evidence substituted receipts which are said to have been executed in February of 1925. It is upon these latter receipts that she largely relies to support her claim. No explanation is made of her evident reluctance to produce these receipts. Three witnesses were introduced to prove their execution: One was her niece, Jewel Hughes, who did not claim to have seen McGuire sign them, but testified that the signatures thereto were his signatures, and that she had seen the original receipts that were lost; another, Inez Hunter, testified that they were signed by McGuire in her home at Cairo, Ill., in February, 1925; and the third, Myrtle Cruse, another niece of the plaintiff, corroborated the testimony of Mrs. Hunter. Both of the two last-mentioned witnesses testified in detail to conversations between the plaintiff and McGuire on that occasion.

McGuire, a bachelor, was a fairly successful business man of Mayfield, Ky. The plaintiff was born in Illinois and went to Mayfield to live when she was eighteen years of age. She first found employment in a mill and later in a mercantile establishment. Shortly after her arrival at Mayfield she met McGuire, and they became intimate friends. In 1904 she went to Desloge, Mo., where she remained until 1914, when she returned to Mayfield. It is said that in the ten years while she was in Desloge she accumulated a considerable sum of money, which she kept at her residence; that upon her return to Mayfield in 1914 she brought with her in a safety box in her trunk two packages containing $4,200 and $3,500, respectively; that on October 20, 1914, she delivered the $4,200 to McGuire to invest for her, and three years later, December 14, 1917, gave him the $3,500 in the other package, which in the meantime she had kept in her trunk. In 1918 she left Mayfield and never returned there to live.

Thereafter, according to her testimony, she saw McGuire once or twice a year at other places, the last time in February, 1925, at Mrs. Hunter's in Cairo, Ill.

There are many improbable and seemingly incredible statements in the plaintiff's testimony. She never inherited any money, and while in Mayfield and elsewhere worked for a modest salary. There is no documentary or even tangible evidence that she possessed at any one time a sum of money approximating either amount that she claims to have given to McGuire. Her counsel attempt to account for this on the ground that she was afraid to deposit her money in banks, but the evidence shows that at different times she had deposits in banks at Mayfield, Ky., Desloge, Mo., and Cairo, Ill. She claims to have been afraid of losing her money—so afraid that she would not put it in a bank; and yet under the necessity of showing that she had a sufficient amount to make the advances sued for she asserts that she carried it from one place to another in a trunk, left it in a trunk in her room while she was absent therefrom all day, and on one occasion put as much as $3,500 behind some boxes on a shelf in a department store. While in Mayfield she bought a small block of stock in a building and loan association and agreed to pay for it on the installment plan. Why she did not pay for it in cash, when, as she claims, she had these sums of money or at least one of them locked up in a trunk, receiving no income therefrom, is unexplained. Another curious circumstance is that, when she concluded to invest the money, she turned over $4,200 of it to McGuire but did not turn over the rest of it until three years later. Strangely enough, too, it appears that throughout all the years in which, as she claims, McGuire had this money, she made no inquiries, or at least was uninformed, as to how it was invested. During all that time she received no income from it, and at no time, not even when she came to Mayfield, after McGuire's death, in 1927, did she know how it was invested. Furthermore, at that time she made no claim against his estate, at least she did not so far as his administrator was advised. Again, taking receipts from the man to whom she delivered the money, she returned them to him in 1918, giving over to him the only written evidence she had of his obligation. Why she did not keep them in her box as she had kept her money or did not immediately reclaim them is inexplicable. She was married in 1925, a few months after the meeting with McGuire in Cairo, and yet, so far as the record

shows, at no time thereafter until after his death did she assert the claim upon which she is now suing.

The evidence of the witnesses who testified to the execution of the receipts in February, 1925, discloses variances and inconsistencies which one rarely encounters in the proof of so simple an act as the signing of a receipt. It is quite as unconvincing as plaintiff's own testimony. Furthermore, it is highly improbable, if not wholly incredible, that McGuire would have discussed his affairs in the presence of these witnesses, one of whom was an entire stranger to him. It was first claimed that the signatures on the receipts were made by McGuire himself, but upon comparing them, in the course of taking the proofs, with other signatures of his, it became apparent that that could not be true. It is now claimed that his hand was injured, and that he either authorized the plaintiff to sign for him or guided the pen while she held it. The details of how this was done, as testified to by the witnesses, are conflicting. The plaintiff admittedly wrote the receipts. The proof for the defendant shows that McGuire's hand was not injured and that the signatures on the receipts were so characteristically different from his normal signature that the pen could not have been guided by his hand. Other circumstances proved by defendant support the view that the receipts are wholly spurious.

 It is not possible within the scope of this opinion to refer in detail to all the evidence touching the fact issue involved. It is clear, however, that plaintiff's evidence lacks the high quality of certainty necessary to the proof of an express trust. Pomeroy's Eq. Jurisprudence, vol. 3, § 1009; McMonagle v. McGlinn (C. C.) 85 F. 88; Allen v. Withrow, 110 U. S. 119, 3 S. Ct. 517, 28 L. Ed. 90. We think it also fails to prove a debt. That there was direct testimony to the effect that McGuire signed the two substituted receipts must be admitted. But that testimony, considered in the light of the other facts, is too inherently improbable for belief. At best it amounts to nothing more than evidence of an oral admission of an obligation. The courts have uniformly held that one who relies upon oral evidence to prove an acknowledgment by a deceased person of an obligation or a debt carries a heavy burden. Lea v. Polk County Copper Co., 21 How. 493, 504, 16 L. Ed. 203; Easton v. Brant (C. C. A.) 19 F.(2d) 857; Succession of McLain, 141 La. 376, 75 So. 85;

In re Gross's Estate, 284 Pa. 73, 130 A. 304; Anderson v. Osborn, 62 Wash. 400, 114 P. 160; Newell v. Estate of Newell, 198 Iowa, 710, 200 N. W. 238; In re Estate of Rich, 199 Iowa, 902, 916, 917, 200 N. W. 713. We think the plaintiff has failed to meet this requirement.

The judgment is affirmed.