MARY ELIZABETH HART, Appellee, v. EARL L. HART et al., Appellants.

WITNESSES: Competency—Transaction with Deceased—Nonparticipation in Conversation. Principle reaffirmed that a party to an action against the grantee of a deceased grantor is competent to testify to a material conversation between said deceased and a third party *in which said witness took no part*. (Sec. 4604, Code, 1897.)

WITNESSES: Credibility—Transaction with Deceased—Nonparticipation in Conversation—Effect. That a party was present at the time of a transaction with a deceased, was vitally interested therein, and was enabled to testify thereto by reason of the claim *that he took no part in said transaction*, are facts bearing very properly on the *weight* of the evidence and the *credibility* of the party testifying.

WITNESSES: Competency—Transaction with Deceased—Allowable Inferences. A party to an action against the grantee of a deceased grantor, wherein the cancellation of the deed is sought, is competent to testify to a state of facts relative to a personal transaction with said deceased, from which state of facts the existence of other facts *may be inferred* (*a rule which the court specifically declines to further extend*), but is not competent to testify to a state of facts *which leaves absolutely nothing to inference*.

PRINCIPLE APPLIED: Simpson deeded lands to defendant. After Simpson died, plaintiff sought the cancellation of the deed, on the claim that Simpson, long prior to the execution of said deed, agreed with plaintiff that, if the plaintiff would render certain services to Simpson and his mother during Simpson's lifetime, plaintiff should have an equal interest in all of Simpson's present and future-acquired property, and at Simpson's death, plaintiff, if she survived, should have *all* the property. Plaintiff claimed that she fulfilled her part of the agreement. On the trial, plaintiff claimed that her own money in part went into the property, and in part was given to Simpson. Plaintiff testified:

1. "Q. Were you informed by any person that if you per-

formed said services you should become a joint owner with Simpson of the land?

2. "A. Yes.

3. "Q. Were you so informed by any person other than Nicholas Simpson?

4. "A. No."

*Held*, Question 3 and Answer 4 left nothing to inference, and plaintiff was incompetent to so testify. (Sec. 4604, Code, 1897.)

**WILLS:** Contract to Devise or Bequeath—Evidence—Sufficiency. Evidence with reference to an alleged contract by which plaintiff was to have all of the property of deceased reviewed, and held too indefinite and uncertain to establish said contract.

*Appeal from Keokuk District Court.— K. E. WILLCOCKSON, Judge.*

SATURDAY, OCTOBER 29, 1917.

SUIT to set aside conveyance of certain lands, and to settle title thereto in plaintiff. From decree as prayed, defendant appeals.—*Reversed.*

*Stockman & Baker,* for appellant.

*Wagner & Updegraff* and *Hamilton & Beatty,* for appellee.

LADD, J.—Nicholas Simpson died intestate, October 21, 1912. Shortly before, on August 15th of the same year, he executed to defendant a conveyance of the land on which he resided, said in the deed to be "45 acres more or less," and by a witness to be about 33 acres. Therein a life estate is reserved to plaintiff, Mary Elizabeth Hart, and the conveyance is subject thereto. Simpson never married. Miss Hart was his niece, being the daughter of Simpson's sister, and came to his home in March, 1878. For about a year and one half she had been an inhabitant of a poorhouse in Ohio, and, though she was never married, had a daughter, who was reared by others. She kept house for Simpson from

the time of her arrival until his death, and besides, cared for his mother, during the first ten years. The defendant, Earl L. Hart, is a son of the plaintiff's brother, upon whose death, in January, 1896, he was brought to the Simpson home. He was born in November, 1890, and resided with Simpson and plaintiff until Simpson's death. Others are made parties defendant, but Earl L. Hart alone appeals. The plaintiff contends that, about the time she came to the home of Simpson, he agreed that, "if she would remain at his home and perform the services of housekeeper and aid him with the work and in taking care of his aged mother, that she should become a joint owner of all the land which he owned, or should afterwards acquire, and that, if plaintiff survived him, that she should become the absolute owner of all the land which he then owned or that he might afterwards acquire during his lifetime;" and that she complied with her part of the arrangement and became owner of the land in pursuance of this arrangement. She prays that the deed from Simpson to defendant be set aside, and also a deed to defendant from Alsop of a parcel of land known as Lot 3, being made in consideration of the conveyance of Lot 4 by defendant to Alsop, in partition, as both lots had been owned by the latter and decedent in severalty; and that she be decreed the owner of said estate. The answer puts in issue allegations of the petition and interposes a plea of estoppel.

To establish the alleged agreement, plaintiff relied on her own testimony and that of the other witnesses. There is no controversy but that she kept house for Simpson, and helped about the place as farmers' wives ordinarily do, and cared for his mother (her grandmother), as claimed, and at the same time was provided a home and board and clothing for herself.

I. In support of the petition, plaintiff testified that, shortly after she arrived at Simpson's home:

1. WITNESSES: competency: transaction with deceased: nonpartici- pation in con- versation.

"Nate Updegraff solicited me to do housework for him. He came to Nicholas Simpson's home about two years after I came there, and I heard a conversation between Nicholas Simpson and Nathan Updegraff, in which I took no part. Q. You may state to the court, in substance, the conversation. A. Well, Mr. Simpson told him that he did not want me to go; that he had no one to do anything for him—to keep house for him; and that, if I stayed with him, that everything was to be mine for my services. Nicholas Simpson said to Nathan Updegraff that he would fail to give me what he had promised if I went; that I was to stay as long as he lived and I lived. I was to do the housework, cooking and washing. I did not go to work for Nathan Updegraff. After that time I never accepted employment away from the home."

This testimony was received, and rightly so, over the objection "incompetent, immaterial, and that the witness was incompetent under Section 4604 of the Code, and because self-serving declarations." As she testified that she did not participate in the conversation, the evidence was admissible. *Mallow v. Walker*, 115 Iowa 238; *McElroy v. Allfree*, 131 Iowa 112; *Calhoun v. Taylor*, 178 Iowa 56.

2. WITNESSES: credibility: transaction with deceased: nonparticipa- tion in con- versation: effect.

But the circumstance that she claimed that, though present, she did not participate in a conversation vital to her own interests, is always a matter to be taken into account in weighing the evidence and in ascertaining the credibility of a witness.

II. Plaintiff was asked:

"After your coming to the state of

3. WITNESSES:
competency:
transaction
with deceased:
allowable in-
ferences.

Iowa, were you informed by any person that if you remained at the home of Nicholas Simpson and performed the service of a housekeeper and to assist in the taking care of the mother of Nicholas Simpson, that you should become the joint owner with him of the land which he then owned and of whatsoever land he might afterwards acquire? A. Yes, sir. Q. Were you so informed by any person other than Nicholas Simpson? A. No, sir."

The answer first above was received over the objection, there being no ruling heretofore set out, and, as we think, cannot be considered. The statute prohibiting a party to any action from being examined as a witness as to any personal transaction or communication between such person and a person since deceased, against the assignee of such deceased person, cannot be evaded in this fashion. For a witness to say something has been done, and that none other than a named person did it, is equivalent to saying that such person did what was done. This method leaves nothing to inference, but is direct testimony of the fact proposed to be proven. None of the decisions go to this extent. In construing Section 4604 of the Code, it is well to bear in mind that it does not prohibit the witness declared to be incompetent from testifying, but from being "examined as a witness in regard to any personal transaction or communication" between the witness and deceased person. "In regard to," as here employed, means "concerning," "with respect to," or "about."

One who denies, testifies in regard to the subject of denial quite as certainly as though he had affirmed. *In re Will of Winslow*, 146 Iowa 67. Swearing that none other than decedent had declared the matters specified, or done the particular thing mentioned, would seem equivalent to

testifying that, if anyone made the declarations or did the
thing mentioned, the decedent was the person, and this would
be giving evidence concerning, with respect to, or about,—
that is, in regard to,—a communication or transaction be-
tween the witness and deceased. The significance of the
peculiar wording of the statute seems to have been over-
looked in some of our decisions, or possibly its restrictions
somewhat limited in the search for truth. However this
may be, in a long line of decisions, beginning with *McEl-
henney v. Hendricks,* 82 Iowa 657, the interrogation of a
witness incompetent, under this statute, to testify in regard
to transactions or communications between the witness and
decedent, has been permitted where the answer, by exclud-
ing all others, included the decedent. In that case, *McEl-
henney v. Hendricks,* supra, the question ruled to be proper
was, in substance, whether checks payable to decedent or
bearer had ever been delivered to anyone other than him, the
issue being whether payment had been made. This deci-
sion was followed by *Walkly v. Clarke,* 107 Iowa 451, where
the inquiry was whether a note and mortgage had been
transferred to anyone other than decedent. In *Graham v.
McKinney,* 147 Iowa 164, the claim was for board, lodging
and keep, and a question as to whether "any other person
than herself had rendered him any services during his ill-
ness," was adjudged proper. In *Yoder v. Engelbert,* 155
Iowa 515, these decisions were followed. But in none was
the inquiry followed by permitting the witness to say that
the particular thing inquired about had been done, as
whether the checks in the first mentioned case had in fact
been delivered or the note and mortgage transferred, and
the like. Nor has the court gone to the length of approving
an inquiry as to whether a conversation described was had
with any person other than deceased. Manifestly, were this

permitted and the witness allowed to add that the conversation was had, the statute would be effectually avoided and rendered inoperative in preventing the examination sought to be prohibited. We are not ready to extend the ruling of these and other like decisions, and thereby further impinge on the manifest meaning and purpose of this statute, Section 4604 of the Code. In our opinion, plaintiff was incompetent, as a witness, to be examined concerning any conversation had with her deceased uncle, or indirectly as to whether an alleged conversation took place, and then whether it was had with any person other than deceased. *Minion v. Adams,* 181 Iowa 267.

III. After testifying to having received remittances of money from her father and brother in sums of $5 up to $20, in all about $500, she was asked:

"What did you do when they were sent to you—what did you do with the several sums of money as you received them? A. A portion of it was used for my clothing, a portion of it for the house, and the balance of it was given to Nicholas Simpson. Q. You may state whether or not you gave any part of this money to any person other than Nicholas Simpson. A. No, sir; I did not. Q. Was this money, or any part of it which you received from your father, used for the benefit of any other person other than yourself and Nicholas Simpson? A. It was not."

These answers were received over the objection last above noted, there being no ruling. A motion to strike out the portion of the first answer referring to the giving of funds to Simpson must be sustained, for that the witness might not be examined as to this matter because of the prohibition of Section 4604 of the Code. This appears to have been conceded by the next interrogatory, which seems permissible under the decisions heretofore cited. *McElhenney v. Hendricks,* supra, was decided over twenty-five years ago, and, though its holding and that of like cases are open to

criticism as impinging on the prohibition of the statute, we are not inclined to interfere with the ruling further than to decline to extend it further, or to carry it to its logical sequence in the utter emasculation of this section of the Code.

IV. Aside from the evidence referred to, one Alsop testified that he lived, for many years, within a few rods of the Simpson home, which consisted of two rooms and a summer kitchen; that he knew of plaintiff's receiving "sums of money, $5 and $10 bills and gold pieces;" that part of it was used to pay for building a summer kitchen and a woodshed; that, in so far as he knew, she used all the money she got on the place, but could not "say just exactly what she did with it;" and further, that, in May, 1911, he "drove up there and came down northeast of the house, talking, and my uncle came out and sit down, and he got to talking, and sit there and talked quite a while, and I asked him what he was going to do—he had been sick, and he was talking about feeling bad, and I asked him what he was going to do with what he had, if he passed away, and he said Elizabeth always stayed there, and helped take care, of mother, and helped on the place, and if she continued to stay there, and continued to take care of him, she was to have what was left."

4. WILLS: contract to devise or bequeath: evidence: sufficiency.

One Bitner testified that he was at Simpson's house in July or August, 1912, and that he then said "he aimed for Elizabeth Hart to have it. He said if he hired her by the week that he would not have anything, because she cared for his mother and for the house; * * * that what money she got from her father, that she let him use it on the place." On cross-examination: "He said that he aimed to leave her all of it, to Mrs. Hart,—all the land."

Beman testified that he operated a hardware store; that, about 10 years previous, Simpson talked about buying

some chicken fence, but remarked that he had no money; that thereupon the witness offered to charge it, if he would tell him whom to charge it to, and Simpson replied: "Well, it would be immaterial, as Lib and I have equal interests there, and it will be paid for;" that both had interests in that land, equal interests. "He said they had one pocketbook; his pocket was hers and hers his."

This is all the evidence bearing on the existence of a contract such as alleged, and we are of opinion that it falls far short of the requirement that such a contract be established by clear, unequivocal and definite proof. *Bevington v. Bevington,* 133 Iowa 351. What Alsop related is entirely consistent with the theory that decedent merely intended to give the property if plaintiff continued in his service, and this is true of the story of Bitner. In neither conversation did decedent allude to any previous or existing arrangement with plaintiff, or that he was to bestow the property in pursuance of any obligation so to do. Such evidence, though indicating a favorable disposition and an existing design to leave the property to plaintiff, is consistent with the nonexistence of any contract so to do. It is of little probative value. *Stennett v. Stennett,* 174 Iowa 431. Beman's testimony is more satisfactory; for, if the statements were made as related by him, decedent declared that he and plaintiff had equal interests in the land and kept a joint purse. This, though not referring to any previous arrangement between them, nor touching upon how such equality came about, may well be regarded as corroborative of plaintiff's testimony of what decedent said to Updegraff over 35 years previous, in that it indicated a condition of things which would have come about had there been such a contract as alleged. The trouble is that there was no sufficient proof of the contract. All the evidence bearing thereon is what plaintiff claims to have heard decedent say

to Updegraff, "that if I stayed with him that everything was to be mine for my services." This might have happened independently of any agreement between them, and it is to be observed that she does not pretend that anything was said with reference to any understanding between her and decedent. What was said is entirely consistent with a purpose on his part, without there having been an understanding between them. Moreover, he then owned but a few acres of the land in controversy, and the word "everything" can hardly be construed to include all property he might acquire within the next 35 years. Surely, the evidence does not meet the requirement of definiteness and clearness in proof. We are of opinion that plaintiff failed to make out a case. This being so, it is unnecessary to allude to circumstances affecting the credibility of witnesses, or to consider the plea of estoppel. The petition should have been dismissed.—*Reversed.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.