JAMES M. PATTERSON, Appellee, v. J. W. CARR, Administrator, et al., Appellants.

**DESCENT AND DISTRIBUTION:** Right of Heir—Release of Inheritance. Evidence reviewed, and *held* that a release by an heir "of all claims against him [intestate] or his estate" was not intended by either party to release the heir's right of inheritance.

*Appeal from Poweshiek District Court.*—D. W. HAMILTON, Judge.

FEBRUARY 17, 1920.

REHEARING DENIED MAY 17, 1920.

SUIT for decree that plaintiff, an adopted son, is entitled to the estate of James Patterson, deceased. Collateral heirs pleaded that plaintiff had relinquished his right to inherit. On hearing, decree was entered, as prayed. Defendants appeal.—*Affirmed.*

*Lewis & Dickson,* for appellants.

*T. K. Kase, Harold L. Beyer,* and *J. H. Patton,* for appellee.

LADD, J.—On the former appeal, plaintiff was adjudicated the adopted son of decedent, James Patterson. 166 N. W. 449 (not officially reported). He was born January 1, 1859, adopted August 30, 1862, married June 15, 1881, and was a member of decedent's family from the time of his adoption until September 19, 1881. On that day, there was a settlement of some kind between them, in pursuance of which decedent paid him $150, and he executed the following writing:

"Montezuma, Iowa, September 19, 1881. Received of James Patterson one hundred and fifty dollars in full of all claims against him or his estate. James Patterson."

This was construed on the former appeal not to be so plain as that parol explanation should be excluded. The issue to be determined is whether the consideration for the payment was wages for services rendered and money due, or for the relinquishment of the adopted son's right to decedent's estate. James Patterson died intestate, unmarried, and without issue, February 23, 1916, leaving an estate consisting of 286 acres of land and considerable personal property. The defendants, other than the administrator, claim the estate as collateral heirs, and base such claim on the alleged relinquishment thereto, evidenced by the writing above quoted, contending that it was so intended by the parties thereto, and also that the adopted son, when he signed, had good reason to suppose decedent so understood. The evidence fails to establish either of these contentions.

I. Previous to James Patterson's death, plaintiff had no right or interest in or to his property which the law recognized. It was pointed out in *Mally v. Mally,* 121 Iowa 169, that the current of authority is to the effect that an assignment of a naked possibility or expectancy of an heir apparent to an estate, if in good faith and for an adequate consideration, will be enforced after the death of an ancestor. See *Stolenburg v. Diercks,* 117 Iowa 25. The word "claim" is so wide that it might include either wages and money due or the expectancy of an heir apparent. In the last edition of Webster's Dictionary, it is defined as:

"(1)  A demand of a right or supposed right; a calling on another for something due or supposed to be due; an assertion of a right or fact.  (2)  A right to claim something; a title to any debt, privilege, or other thing in possession of another; also, a title to anything which another should have or concede to, or confer on, the claimant."

The Century Dictionary defines it as:

"(2)  A demand of a right or alleged right; a calling on another for something due or asserted to be due, as a claim of wages for services.  (3)  A right to claim or demand; a just title to something in one's own possession or at the disposal of another."

See, also, *Tally v. Brown,* 146 Iowa 360, 364; *Marsh v. Benton County,* 75 Iowa 469; *Fallon v. Butler,* 21 Cal. 24 (81 Am. Dec. 140) ; 11 C. J. 816.  We must ascertain, then, from the evidence, what was intended.  But the receipt is of claims "against him or his estate."  Claims against an estate are in the nature of pecuniary demands which could have been enforced against the decedent, had he not departed this life.  *Knutsen v. Krook,* 111 Minn. 352 (127 N. W. 11).  Plaintiff had no claim against his foster father, save for the money paid him, nor against any estate he might leave.  His claim, if any he had, was "to" the estate, as heir apparent.  The word "against," in ordinary parlance, is used in an antagonistic sense, and the lexicographers so define it.  Thus, Webster says it means:

"(1)  Abreast of; opposite to; facing; towards; as, against the mouth of a river; in this sense, often preceded by 'over.' *  *  *  (3)  From an opposite direction, so as to strike or come in contact with; in contact with; upon; as, hail beats against the roof.  (4)  In opposition to, whether the opposition is of sentiment or of action; on the other side of; counter to, as in competition; in contrariety to; hence, adverse to; as, against reason; against law; to set off one item against another."

The courts have made like use of the word, and, as appears from cases collected in 2 Corpus Juris 400, and defini-

tion there given, are in accord with the definition above quoted.

That the writing was drawn with the notion of includ- ing all obligations of the decedent, and to obviate the as- sertion of any thereafter against him or against the estate he might leave, is quite consistent with the language of the writing, and more probable than that it was intended as a relinquishment of the right of inheritance by the heir apparent. Moreover, the evidence, without conflict other than circumstantial, discloses the consideration for the money paid. The plaintiff's wife testified that she was pres- ent, and took no part in the conversation then had between decedent and plaintiff; that decedent said to her husband:

" 'One hundred dollars of that money belongs to Eliza. You had better not spend it, as you may need it when you get to California.' He always called me Eliza. 'The rest of the money is your wages.' "

In answer to another interrogatory, she reported him as saying, "That is what is coming to you children." Objection was interposed to the competency of the witness, under Section 4604 of the Code; but, under previous holdings, the testimony was admissible. She had said that she took no part in the conversation, and, according to her story, all that decedent said was addressed to her husband. *Hart v. Hart,* 181 Iowa 527. Evidence was adduced, tending to show friendly relations between plaintiff and his wife and decedent at the time. Shortly thereafter, plaintiff and wife departed for California, and neither visited decedent during 27 years. Not infrequently, natural sons separate them- selves from parent as long; and that a man not related by consanguinity should become too diligent in his own affairs to respond more generously to the paternal ties which once bound him, is entitled to little consideration, as bearing on the issue to be decided.

In March, 1916, J. W. Satchell informed plaintiff of his foster father's death, and, shortly afterwards, he wrote to Mrs. Cooper, the father's sister, recalling a visit at which,

as he said, she "had expressed the opinion I was heir to father's estate," and proceeded:

"How much property did father leave, and who is claiming it? * * * Please let me know what the administrator is doing, and whether you think there is any chance of my being recognized."

It is argued that this inquiry tends to confirm the thought that he had relinquished. Not so. He was a blacksmith by trade, and, it is likely, may not have been familiar with the inheritance laws of a state other than that of his residence, after an absence of 35 years. Moreover, the inquiry was quite natural for a son by adoption to make, and we are of opinion that no inference unfavorable to plaintiff's insistence upon the right to inherit is to be drawn from the letter. The writing was found in an old trunk left by decedent, among papers left by him, some of which were old and useless; and no more significance is to be given to its preservation than to that of others. All of them seem to have been retained without discrimination. We find nothing in the record tending to throw doubt on the testimony of Mrs. Patterson, and we are inclined to the conclusion that there was no purpose, on the part of either decedent or his foster son, that the writing should operate as a relinquishment of the latter's expectancy as heir apparent to the former's estate.

II.   Our statute, Section 4617 of the Code, provides that:

"When the terms of an agreement have been intended in a different sense by the parties to it, that sense is to prevail against either party in which he had reason to suppose the other understood it."

Appellants contend that plaintiff had reason to suppose that decedent understood that, in executing the writing, he released his expectancy of inheritance. Satchell testified that plaintiff so admitted to him, and, in determining whether he so did, resort must be had to the evidence. Satchell testified that, at the request of the administrator, he called on plaintiff and wife, at their home in Los Angeles,

California; that he and plaintiff talked about the writing. He was asked:

"Did he say anything to you about what he thought James Patterson receipted that paper for, in reference to whether it was a release of his share of the James Patterson estate or not? A. Yes, sir. Q. What did he say about what he thought James Patterson receipted that paper for? A. He said he thought James Patterson understood it to be a settlement of his in the estate. Q. Now, is that all the statement he made to you on that particular subject? A. I think that was all. * * * Q. Did he or his wife tell you in his presence that, what the $150 consisted of, or any part of it; just what they said to you? A. Mr. Patterson said that, at one time, Uncle Jimmy gave him $50, and that he asked him, when he gave him the money, to sign a receipt for it. He asked Uncle Jimmy what the receipt was for, and he said: 'Nothing, only for what money I am paying you.' Q. Was there any more said about the rest of the money? A. I suggested to him that he was probably mistaken about the amount, as I understood it was $150, instead of $50. After talking, they agreed that it was $150, instead of $50; but the $100 of the money was his wife's, a specified sum per month for staying there at Uncle Jimmy's, and taking care of his things while he went out to California to sell some land. They did not explain as to what the other $50 was for."

On cross-examination, the witness was asked:

"Q. While you were talking the matters over, Mr. Patterson, the plaintiff, told you he understood that his father, James Patterson, thought this was a receipt in full for his interest in the estate? A. Yes, sir. Q. That he had heard that from some source? A. He said that he had no doubt but that his father understood it. Q. Didn't he tell you, in substance, that the money that was paid to him by his father, for which he gave his receipt, was for wages? A. Yes, sir. * * * Q. Some of it was for something else? A. Yes, sir, didn't express what the other paid was for. * * * Q. You were trying to figure out what the $150 was for?

A. I think Mrs. Patterson suggested that the $100 was for wages; they talked about it. * * * Q. In that conversation between you and plaintiff and his wife, was anything said about that, that was a relinquishment of his interest in the estate? A. I think he said that he had no recollection of having relinquished his interest in the estate. Q. Did he say, in that conversation with you, that his father, when he paid him $50, told him he just wanted a receipt for money paid? A. Yes, he said that. * * *"

The witness remarked to Patterson that:

"There was a receipt that Capt. Carr had that purported to be a relinquishment to his inheritance in the estate. Q. Didn't he deny it? A. Said he didn't understand it that way. Q. He told you at that time, in substance, that he had not relinquished his right to the estate? A. He said he had no recollection that he signed anything or any receipt to relinquish his interest in the estate. Q. He stated to you at that time, in substance, that he may have given his father a receipt for wages due him? A. He said it was for wages due him,—yes. Q. And then, the rest of the time there, you just visited back and forth? A. Yes, sir."

If this testimony requires any refutation of what the witness said of plaintiff's knowledge that decedent understood that the writing was "a settlement of his interest in the estate," it is to be found in other portions of his deposition. If Uncle Jimmy said, in requiring a receipt, that it was for "nothing, only for what money I am paying you," he surely did not have the understanding attributed to him, nor did plaintiff so suppose. The witness admitted that plaintiff told him the receipt was for wages, and that he had no recollection of having relinquished his interest in the estate, or of having signed a receipt so doing. How were it possible that, at the same time, he supposed that his foster father understood he was relinquishing his interest in the estate? The plaintiff and his wife admit having had a conversation with Satchell, and relate the substance thereof, which did not include what plaintiff supposed decedent understood; and they say, "That was all the conversa-

tion between us." No other evidence was adduced, and we are of opinion that the court did not err in finding that plaintiff, in executing the writing, which we regard as no more than a receipt in full, did suppose or have reason to suppose it a relinquishment of plaintiff's expectancy as an apparent heir.—*Affirmed.*

WEAVER, C. J., GAYNOR and STEVENS, JJ., concur.