WM. J. STENNETT, Appellee, v. RUBEN J. STENNETT et al., Cross-appellants, FRANK STENNETT, Intervener, Appellant.

WILLS: Contract to Devise—Performance—Evidence Required. Contracts to care for and support a parent in return for the parent's property demands proof which is *clear, unequivocal* and *definite,* and the acts said to constitute performance must be equally clear and definite and *referable exclusively to said contract.* Evidence reviewed, and *held* insufficient to establish the contract alleged.

DESCENT AND DISTRIBUTION: Right of Inheritance—Waiver by Contract—Validity. A contract with reference to a mere expectancy in an estate may be valid; and in such case, when the descent is cast, the heir is estopped to deny the effect of his contract. So *held* where a father conveyed lands to his sons and the sons agreed to accept the same in full satisfaction of their interest in the estate of their father.

DESCENT AND DISTRIBUTION: Heirs—Presumption As To Issue—Evidence. The law presumes issue from the fact of marriage. Therefore, proof that certain persons are the only surviving children of the parent does not establish the fact *that they are his only heirs,* when it appears that another child of the parent, once married, had died prior to the parent.

QUIETING TITLE: Demand for Quitclaim Deed—Estate Matters— One Deed for All Heirs. Where certain heirs were ruled to be obligated to execute a quitclaim deed to certain other heirs,

part of whom were known and had demanded such deed, and part unknown, it is deemed preferable, under the record, to remand the cause, in order that all the heirs may be determined and be made grantees in such deed, even though a general quitclaim deed to the known heirs might possibly have no effect on the unknown heirs.

**QUIETING TITLE:** ·Demand for Quitclaim Deed—Excessive Demand —Costs and Attorney Fees. One who expects to impose costs and attorney fees by making demand for a quitclaim deed must see to it that he demands exactly that to which he is entitled. An *excessive* demand may defeat his purpose. So *held* where a *part* of tenants in common demanded a deed carrying *all* the interest of the grantors. (Sec. 4226, Code, 1897.)

**QUIETING TITLE:** Demand for Quitclaim Deed—Tenants in Common as Grantees—Joint Demand. A demand by several tenants in common for one quitclaim deed to them as joint grantees may be sufficient to impose costs, under Sec. 4226, Code, 1897.

*Appeal from Calhoun District Court.*—F. M. POWERS, Judge.

SATURDAY, FEBRUARY 19, 1916.

DECREE was entered dismissing the petition of intervention and awarding the plaintiff relief as prayed. The intervener and defendants appeal.—*Modified* and *Remanded.*

*Frick & Frick,* for intervener, appellant.

*L. H. Salinger* and *Brown McCrary,* for cross-appellants.

*E. C. Stevenson* and *Kelleher & Price,* for appellee.

LADD, J.—John Stennett died intestate, March 30, 1913, seized of the NW ¼ NE ¼ of Section 34, the N ½ SE ¼ of Section 26, and the SW ¼ NE ¼ of Section 26, in Township 86 N., of R. 34 W. of 5th P. M. His wife had departed this life some time before, and he left surviving the following children only: William J., Frank, Ruben J., and Charles M. Stennett. On December 11, 1911, the deceased entered into a contract with Ruben and Charles, wherein it was stipulated that:

"In consideration of the party of the first part (John Stennett) executing a warranty deed to the parties of the second part (Ruben and Charles), to the Southwest Quarter and the Southwest Quarter of the Northeast Quarter and the East Half of the Southeast Quarter of the Northwest Quarter of Section Thirty-four, Township Eighty-six North, Range Thirty-four West of the 5th P. M., Iowa, and the further consideration of the releasing of the parties of the second part from all claims now held against said parties of the second part by the party of the first part, the parties of the second part hereby agree upon their part to pay off and discharge the $2,500.00 mortgage to Mary E. Stevens, together with the interest from December 1st, 1911, and agree to pay the drainage taxes and assessments now levied or to be levied on said described land, and they further acknowledge said conveyance and settlement as a full advancement of each and all their interests in and to the estate of John Stennett, and hereby agree to release and relinquish at any time when called upon to do so by quitclaim deed or otherwise any and all interests which they may have in the estate of John Stennett at his death, hereby agreeing to quitclaim and relinquish to the legal heirs or devisees of John Stennett as the case may be any and all interests in and to his real estate and personal property of which he may die seized or possessed, the intention being that the above conveyance shall be an advancement and full settlement of all the interests said parties of the second part may have in the estate of John Stennett at his death."

The sons also agreed to pay the expenses of such settlement by way of fees of $50 each to the respective attorneys. All three signed this agreement, and on the same day, John Stennett executed to Ruben and Charles a warranty deed conveying to them said land subject to the mortgage thereon, and reciting that "this deed is made as the advancement of the shares or interest the said grantees have or may have in the estate of the grantor". On September 8, 1913, William

and Frank caused to be served on Ruben and also on Charles a notice addressed to each separately and signed by both William and Frank, "requesting each to execute to them a quitclaim deed of real estate of which John Stennett died seized within 20 days thereof", tendered to each $1.25 for the expense of so doing, and advised each that, upon failure to comply, action to quiet title would be brought, under Section 4226 of the Code. Thereupon, separate suits were begun against each of defendants, praying that title to said lands be quieted in William and Frank, and that the contract be specifically performed. These suits were consolidated, when Frank filed a petition of intervention, alleging that he was made plaintiff in said suits without his consent and would not prosecute as such, and further, that, about March 1, 1912, he entered into oral agreement with his father, John Stennett, by the terms of which he was to use and occupy the N ½ SE ¼ and the SW ¼ NE ¼ of said Section 26, known as the home place, during the life of said John Stennett, was to care for him and pay him $3.00 an acre, if his father should require same, and by which, if said intervener performed his part of said oral contract, the said real estate would be and become the property of this intervener upon the death of said John Stennett; and that he (the intervener) had fully performed his part of the contract, and prayed that title to said land be quieted in him against the other parties to the action. The answer of William put these allegations in issue and averred that Frank is estopped from claiming the entire 120 acres of land. Later, William amended the petition by alleging himself the owner of an undivided half interest in the 160 acres, and prayed relief accordingly. The defendants, Ruben and Charles, alleged, among other things, that the deceased, prior to his death, revoked the contract with Ruben and Charles, and that it is void as against public policy, and was never delivered.

I. The issues raised by the petition of intervention may

first be disposed of. Frank had lived on the farm with his parents 32 months, and left, owing to ill health of himself and wife. He returned in about a year and four months, on March 2, 1912. His mother had died in the meantime, and his father continued to occupy a room in the house and lived with intervener's family until his death, on March 30, 1913. Was there an oral contract, such as alleged, and did Frank return and care for his father in pursuance thereof? The rule is well settled that, to establish such a contract, the proof must be clear, unequivocal and definite, and that the acts said to constitute performance should be equally clear and definite and referable exclusively to said contract. *Chew v. Holt,* 111 Iowa 362; *Bevington v. Bevington,* 133 Iowa 351; *Boeck v. Milke,* 141 Iowa 713.

1. WILLS: contract to devise: performance: evidence required.

The evidence of witnesses indicative of an unexecuted purpose of deceased to make a future disposition of the property "lends little countenance to the idea that he had already made such a definite and specific contract to convey as to prevent his changing his mind and refusing to carry out the arrangement if he saw fit". *Boeck v. Milke, supra; McDonald v. Basom,* 102 Iowa 419.

The tendency of most of the evidence was to prove a purpose on the part of deceased that Frank should have the 120 acres. Such evidence, though proving a favorable disposition and an existing design to bestow the property on the claimant in the future, is entirely consistent with the nonexistence of any contract, and therefore not of much probative force. The testimony of but two witnesses bore directly thereon. One Sifford swore that he had lived on the farm before Frank returned; that he had a conversation with John Stennett, in the course of which he advised him (Stennett) "to get Frank and his wife back"; that deceased said to the witness, "The next time you see him, you have a talk with him and find out if he would come back"; that when he met Frank the next

time, he told him what had occurred, and Frank responded
that he had a better thing, and on being asked "What would
you do?" said that "if he could get off up there, he would
go down there and pay the old man $3.00 an acre for the land
and keep him and his team as long as he lived, if he would
get that place when the old man was through with it". The
witness testified further that he told John Stennett what
Frank had said, to which the former responded that "if he
would do that, he ought to have the place", and said, "You
tell Frank that", and the witness informed Frank. It will
be noticed that what the deceased said was that he ought
to have the land if he would do that; but there was no agree-
ment shown, even through this witness.

The plaintiff's case, then, necessarily rests upon the testi-
mony of one Ben Spore, who appears to have lived with de-
ceased during the winter of 1911 and 1912, and testified to
having been there when Frank talked with his father about
moving back, and that "The old man told him that if he
would come down there and take care of him the rest of
his life, he would give him the 120 acres when he was through
with it, the home place. He was to have $3.00 per acre pro-
vided that he called for it and Frank was not to pay for it
until he asked for it. Frank told him he would come down
under this condition."

Frank moved on the farm about the 2d of March, and
the witness left the next day. He (the witness) testified
further that the deceased used the term "the home place",
which was the 120 acres in controversy. On cross-examination,
it appeared that this witness had been stopping with Ruben
and Charles; that during the previous year and a half, he
had been in six different states, drifting from place to place;
and that, ever since he "grew up", he had "wandered from
one place to another", except when he made his headquarters
with Ruben and Charles. His credibility was further some-
what impaired by the testimony of William's wife, that Spore

had said to her at the time and place mentioned in questions to Spore, in response to an inquiry of him whether he had heard Frank ask or demand a deed to the home place of his father, that Grandpa answered, "Not by a damn sight; that any fool or stranger would come into the home place if he could get a deed to it; . . . that if Frank came back, he would have to come back as a renter." Moreover, there is much in the record indicating the claim of Frank to have been an afterthought. Thus, he signed the notices demanding quitclaim deeds from Ruben and Charles to him and William, and made no objection to the statement of the attorney indicating that if quitclaim deeds could not be procured through another attorney, he would begin suit. He gave the attorney the description of the real estate, and, upon saying he could not qualify as surety on the bond of William as administrator of the estate of deceased, was informed by the attorney that he was owner of an undivided one half of the 160 acres left by his father, and immediately signed and qualified. Again, he agreed to continue in possession at a rental of $3.00 an acre and admitted owing a balance of $240 as rent for the year previous to his father's death. According to William, he expressed his dissatisfaction because the farm was not left to him, but did not mention any agreement with his father until in November, 1913, when he refused payment of rent. Frank insisted that he told William of the alleged agreement in the spring and testified to having agreed with Ruben and Charles that if their contract with deceased were broken, he would convey to them his interest in the 40 acres, and that they would quitclaim to him their interest in the 120 acres constituting the home place. Enough has been set out, without alluding to other items of evidence, to have justified the trial court in rejecting the intervener's claim. If Mrs. Stennett is to be believed, Spore was impeached; for he was unable to recall whether he made the statement to her. Moreover, his mode of life was such as to throw doubt upon his

credibility. Add to this the equivocal attitude of the intervener, and it may safely be said that the proof falls far short of being of the character exacted by the rules of evidence in such cases, and there was no error in dismissing the petition of intervention.

II.   Charles and Ruben Stennett insist that the contract was and is void as against public policy, testamentary in character, and in conflict with the statutes of descent. In *Jones v. Jones*, 46 Iowa 466, such an agreement was upheld as a valid contract, and it was held that, upon descent's being cast, the instrument took effect and operated by way of estoppel. This conclusion necessarily disposes of the above criticisms. That case has been followed by *Richey v. Rowland,* 130 Iowa 523; *Mally v. Mally,* 121 Iowa 169, and *Betts v. Harding,* 133 Iowa 7, leaving undecided only whether the transfer of the estate in expectancy must be, in order to be valid, with the ancestor's knowledge and acquiescence. We are not inclined to reconsider the question; and, as the contract here was at the instance of John Stennett, deceased, and he performed his part, these parties are without excuse for their refusal to carry out their part of the agreement. The suggestion that they were in some manner coerced is without foundation in the record.

III.   It is contended further by counsel for Ruben and Charles that, though they, with William and Frank, are the only surviving children of deceased, the evidence fell short of proving them the only heirs. As said in *Skinner v. Fulton,* 39 Ill. 484, proof that certain persons are the only children who survived their father does not establish the fact that they are his only heirs. It may be that the ancestor had other children who died before he did, leaving issue who survived their grandfather. It should be shown whether he left such grandchildren, and leave the law to decide who are the heirs.

*Marginal notes:*

2. DESCENT AND DISTRIBUTION: right of inheritance: waiver by contract: validity.

3. DESCENT AND DISTRIBUTION: heirs: presumption as to issue: evidence.

It appeared that a twin brother of William's died about ten years previous to the trial, and that a sister, Mary, departed this life in 1881, after having married. Though the law presumes, in the absence of evidence to the contrary, that an intestate has left heirs capable of succeeding to his estate, there is no presumption as to who they are, and as all are single when young, this status will not be presumed to have been changed. But the sister had been married, and from this fact, the law raises the presumption that she left issue surviving. *Skinner v. Fulton, supra; Faulkner v. Williman,* (Ky.) 16 S. W. 352; *Stinchfield v. Emerson,* 52 Me. 465 (83 Am. Dec. 524); *Posey v. Hanson,* 10 App. D. C. 496. Whether this is a presumption of law or an inference to be drawn from the fact of marriage is not material to determine; for in either event, the record contains nothing tending to overcome it. The four sons were not shown to have been the only heirs.

IV.   Ruben and Charles had acknowledged the conveyance to them by deceased "as a full advancement of each and all their interests in and to the estate of John

4. QUIETING TITLE: demand for quitclaim deed: estate matters: one deed for all the heirs.

Stennett", and agreed to "quitclaim and relinquish to the legal heirs or devisees of John Stennett as the case may be any and all interests in and to his real estate . . . of which he may die seized". A conveyance was made by deceased to these sons at the same time, and the contract recites that the intention was that this "shall be advancement and full settlement of all the interests" the sons may have in the estate of the father at his death. Moreover, the deed to them recites that it is such advancement. To heirs other than Ruben and Charles, the latter should have conveyed any interest they had in the land. Though on the face of the record they appeared to share the estate of deceased with the other heirs, William, Frank and the issue of Mary, if any, were the equitable owners; and as the issue of Mary were parties neither

to the demand nor suit, their share could not be affected by any conveyance Ruben and Charles might have made; and even though there may have been living issue of Mary, they were not relieved from executing quitclaim deeds to such of the heirs as required these under the contract, by the fact that no claim thereto was made by another or others. But the demands for quitclaim deeds made by William and Frank were for the entire quarter section of land, and not for parts thereof belonging to them. Undoubtedly, instruments might have been drawn which would have carried the legal title appearing in the names of Ruben and Charles to their two brothers, and yet saved that which would appear to be proper to convey to the issue of Mary, and possibly quitclaim deeds to the entire land might not have affected any interest belonging to such issue. As the issue of Mary, however, is only presumed, and as the title to the land may and should be settled in the one suit, we deem it preferable that the cause be remanded, in order that additional evidence may be adduced and all the heirs of the deceased be definitely ascertained and a decree be entered accordingly.

V. The court taxed attorney's fee in favor of plaintiff's attorney in the sum of $160, and to this these appellants except, on the several grounds: (1) That the demand for quitclaim deeds was by William and Frank jointly, though they were tenants in common, each holding title in severalty, and each must have prosecuted separate causes of action to enforce the contract; (2) the tender of $1.25 for expense of executing deed was insufficient, inasmuch as William and Frank held title in severalty, and each should have tendered the amount; (3) the defense was in good faith and no fees should have been taxed; and (4) the amount was in excess of that authorized by Section 4226 of the Code.

5. QUIETING TITLE: demand for quitclaim deed: excessive demand: costs and attorney fees.

The demand was for a "quitclaim deed to William J. Stennett and Frank Stennett for the following described real

estate", describing it, and this was made on Ruben and Charles separately, and the fee of $1.25 ten-

**6. QUIETING TITLE: demand for quitclaim deed: tenants in common as grantees: joint demand.** dered to each. Under the contract, they were bound to quitclaim to the heirs of deceased other than themselves. This did not require that they should execute a separate deed to each, but one deed to all would have sufficed. A conveyance to several tenants in common as grantees in one deed would have passed to them the interest of each quite as effectually and accurately as though a deed of an undivided fractional part were executed to each of such tenants separately. As one deed would have sufficed for all purposes, the joint demand by the tenants in common complied with the requirement of Section 4226 of the Code. The demand, as said, was for quitclaim deeds of the entire estate apparently in Ruben and Charles to Frank and William. The evidence failed to show that they were the only heirs other than defendants, or that they were entitled to deeds such as they demanded. Moreover, Frank, who signed the demand, withdrew as plaintiff, and as intervener asserted ownership, independent of the contract, to 120 acres. The statute, Section 4226 of the Code, is penal in character (*Lawless v. Stamp*, 108 Iowa 601), and therefore is to be somewhat strictly applied, and it is not exacting too much to require that the demand be for a quitclaim such as the party on whom served may properly execute. The taxation of such fees is discretionary (*Collier v. Wetmore*, 164 Iowa 344), and in view of the nature of the demand and proof and the assertion by the intervener of ownership of the 120 acres, we are inclined to the opinion that the circumstances were such that attorney fees should not have been taxed against defendants. One half of the costs will be taxed against the intervener, one fourth thereof against plaintiff, and the remainder against defendants. The decree will be modified accordingly, and the cause remanded for procedure not inconsistent herewith.—*Modified* and *Remanded.*

EVANS, C. J., GAYNOR and SALINGER, JJ., concur.