## IN RE ESTATE OF J. W. RICH.

ETHEL R. GOLDEN, Appellant, v. IOWA CITY STATE BANK, Executor, Appellee.

**WILLS:** Contract to Will—Evidence—Sufficiency. An alleged oral
1 contract to will property must be supported by testimony other than
the vague expressions of witnesses of what they think they have
heard another person declare, and attempts to express such declara-
tions in their own language.

**TRIAL:** Reception of Evidence—Reopening Case. Whether a case
2 should be reopened for additional testimony after the parties have
rested, is a matter resting very largely in the discretion of the court.

**APPEAL AND ERROR:** Harmless Error—Duplicate Reception of Evi-
3 dence. Reversible error may not be predicated on the reception in
evidence of an exhibit when the contents of such exhibit are al-
ready in the record without objection.

Headnote 1: 40 Cyc. p. 1072. Headnote 2: 38 Cyc. p. 1365. Head-
note 3: 4 C. J. p. 978.

*Appeal from Johnson District Court.*—RALPH OTTO, Judge.

NOVEMBER 11, 1924.

REHEARING DENIED MARCH 21, 1925.

PROCEEDING in probate, to establish a claim against the
estate of J. W. Rich, deceased. The claim was in two counts.
The first count was in the nature of a claim for services ren-
dered. In the second count, the question was whether there had
been a promise or contract on the part of said deceased to leave
to the plaintiff the estate remaining at his and his wife's death,
for services rendered in caring for them, and the amount of
damages because of failure to so do. There was a considerable
estate, amounting, it is said, to approximately $100,000. Trial
to a jury. The trial court directed a verdict for the estate as to
the second count. The first count was submitted to the jury,

and a verdict was returned for plaintiff in the sum of $2,750. The plaintiff, or claimant, appeals.—*Affirmed.*

*Remley & Russell*, for appellant.

*P. A. Korab, Randall & Korab,* and *Frank F. Messer,* for appellee.

PRESTON, J.—1.  The large question in the case, as we view it, is whether the evidence was sufficient to take the case to the jury on the second count of the claim, though the errors assigned relate to the admission and exclusion of evidence, and other rulings as to both counts, and complaint is made of two or three instructions given by the court as to Count 1. As said, the more important question is as to Count 2, and this turns largely on the question as to whether plaintiff has shown that there was such a contract as she alleges, by that quality and quantity of evidence required in such cases. It is largely a question of fact.

There are two amendments by appellee, to appellant's abstract, and a denial thereof by appellant, with a certification of the complete record. This requires us to first examine the abstract, then the amended abstract, to see what denials and corrections are made, then appellant's denial, to see what she denies, and then the transcript, to settle the matter, making an examination of the four documents at the same time to determine what the evidence is on a given point. Appellee denies, strikes out, and substitutes, here and there, a word, sentence, or page. The corrections are denied by appellant. Under old Rule 34, the order granting the certification could have required an additional abstract, designating the portions of the record in dispute. Though not required to do so, we have thought it less laborious to go directly to the transcript for a careful and thorough examination of the evidence on the important questions in the case.

Before doing this, it may be proper to refer to some matters bearing on the general situation. The original claim, filed August 13, 1920, states, in substance, that, about November 1, 1912, claimant, at the instance and request of said J. W. Rich, entered into his employment as companion for himself and wife; that said employment continued for about one and one-half years, ceased for about two years, and was resumed again upon the

death of the wife of deceased, and continued for four years, to the time of the death of Mr. Rich; that during said four years claimant was the manager öf the home of said Rich, his companion, secretary, and, during his illness, his nurse; that her services for such employment were reasonably worth· $10,000; that she has received in cash and bonds about $3,625; that there is a balance due her from said estate of $6,375. On May 8, 1921, plaintiff amended her claim as Count 2, stating substantially that, upon the death of the wife of said J. W. Rich, about 1916, plaintiff was solicited by deceased to cease the business in which she was engaged in North Dakota 'and dispose of her property and come to Iowa City, to be manager of the home of deceased and to be his companion, secretary, and nurse; that, deceased having no near relatives who had strong claim upon his bounty, he verbally agreed that he would, in consideration of the said plaintiff's coming and taking care of him, etc., leave his estate, other than a few bequests, to plaintiff; that plaintiff did dispose of her business, at a financial loss, and from that time for four years prior to the death of said J. W. Rich, she performed the services before mentioned; that deceased did not make ample provision in his will, giving to plaintiff the property which he possessed at his death, and, on the contrary, failed to make provision agreed upon, as aforesaid; that, by reason of the failure of deceased to devise to her as aforesaid, she has been damaged in the sum of $90,000. On December 10, 1921, plaintiff amended her claim, to make the same more specific, as required by the court, and amends Count 1 and strikes out the words "November 1, 1912," and inserts in lieu thereof, "the latter part of February, 1912;" withdraws and strikes out from her claim, beginning with the words "the sum of $10,000," and inserts in lieu thereof "the sum of $15,000, and that she has received in cash approximately $1,625, and that there is a balance due her from said estate of $13,375;" makes more specific the character of services performed; amends the second count by striking out the words "she avers that, upon the death of the wife of said J. W. Rich, about 1916," and inserting in lieu thereof the words "that, in the latter part of February, 1912,—the exact date she cannot state;" further amends Count 2, and avers that it was understood between J. W. Rich and plaintiff that, with the ex-

ception of a few special legacies, amounting to $12,000 or $13,000, the balance of his estate would be left to plaintiff, that the exact amount she is entitled to depends upon the assets and value of the estate, and that she is informed and charges that, to the best of her knowledge and belief, said estate, after payment of special legacies, costs, and taxes, would leave $90,000.

The answer denies all allegations of both counts, and avers that plaintiff has been fully and completely paid for all services performed or acts done by her for deceased, and that any other services done by her were without expectation or promise of compensation therefor, and were a gratuity.

No written contract was shown. Plaintiff claims that there were some letters bearing upon the subject, but that they were lost. Mrs. Rich had a paralytic stroke in 1913, and died about 1916. J. W. Rich died in 1920. In April, 1915, he executed a will; and in December, 1915, he executed a codicil thereto. By the will and codicil, deceased gave his property to his nephews and nieces and other relatives. The will and codicil reserve the right to make a partial distribution of his estate during his lifetime, or to make any gift or donation during his life, whether to a legatee or not, and provide that any gift or donation made as such, when made to any of the legatees, should not be taken into account and deducted from the share of such legatee, etc.

The evidence tends to show—some of it without dispute—that plaintiff had known Mr. and Mrs. Rich from her childhood; that she lived with them while she attended the university; that she graduated in 1898; that in 1903 she attended summer school, and lived with them. A witness testifies to having lived with the Riches in their home from August, 1904, until June, 1905; that Mr. and Mrs. Rich were the only ones living there then. "Was working for room and board while attending the university." During that time, plaintiff visited the Riches three times. Mrs. Rich, at the table one day, said, in Miss Golden's presence:

"We are trying to get Miss Golden to make her home with us, and come and live with us, and make her home with us."

Witness further testified that Mr. Rich was present; that she saw Mr. Rich frequently after she graduated; that she met him on the street sometime in 1919, and had a conversation with him; that he said, "We have made Miss Golden an offer which

is well worth her while to quit teaching and take care of me;''
that she saw him after that; that he was more feeble than he had
been; that, in 1904 and 1905, he appeared to be in good health.

''Miss Golden was not teaching at the time I met Mr. Rich
on the street in 1919.''

Plaintiff taught school for a time at Fort Dodge and other
places. She had made preparation to teach certain methods, and
such services were in demand. She then took up a claim in
North. Dakota, and afterwards bought a farm in Minnesota.
There was more or less correspondence between her and the
Riches during that time. Plaintiff visited them three times in
1907. In 1912, she sold her farm in Minnesota, preparatory to
moving to her farm in North Dakota. She disposed of her stock,
rented her farm in North Dakota, and came to Iowa City in
1912, and went to the home of the Riches. Witnesses testify to
her efficiency in performing her duties in employing help, pay-
ing help, giving directions, and so on, while she was at Riches'.
On the other hand, there is evidence tending to show that plain-
tiff was at the Rich home from November, 1912, to March, 1914,
but not that she performed any services during this period;
that she began to teach school in March, 1913, and continued
to do so until June, 1919; that during this period she had her
board and room without charge; that a maid did the regular
work; that plaintiff ceased to live at the Rich home in March,
1914, and did not come back until April 1, 1916; that Mr. Rich
had been in California from April, 1915, to April, 1916; that,
from that time until his death, plaintiff continued to reside at
the Rich home; that from this period until his death, in 1920,
maids, paid by deceased, did the housework; that plaintiff did
perform certain services for him, for which he gave her a home
and a salary of $100 a month, at least during the last year of
his life.

At the request of counsel for defendant, plaintiff, while on
the stand, produced fifteen checks in this form:

"July 7, 1916

Iowa City State Bank.

Pay to            Ethel R. Golden            or Order $100.00''

All were for $100 each, except one, which was for $150.

All were indorsed by plaintiff. Witness P. A. Korab, vice president of the bank, says that, after the death of Mr. Rich, plaintiff talked to him with regard to a claim; that he received Exhibit 17 (the statement hereafter referred to) from Miss Golden.

"I think she first handed me Exhibit 18. She told me, when she handed me 18, that she was getting a salary of $125 for the last month, and that she had received $100 a month previous to that. She asked me to continue paying her a salary because of Exhibit 18, and I did. I took charge of the Rich estate immediately after his death."

Witness identified other checks, Exhibits 19 to 29, signed by himself, in charge of the estate, and testified that he had delivered them to plaintiff, and that her indorsement was on the back. Witness produced two other checks which he said he found in the bank, which were paid prior to Mr. Rich's death, and testified that the checks were in plaintiff's handwriting, as was also her name, indorsed thereon. Plaintiff denies a part of Korab's testimony.

Soon after the death of Mr. Rich, plaintiff made a somewhat full written statement of the matter. This statement was offered in evidence by defendant, and takes up six pages of the printed abstract. We assume that the purpose of defendant in offering this in evidence was to negative the claim of plaintiff that there was a contract for practically the entire estate. There are some details in the statement which are not very important. It is too long to set out in full here. Parts of the statement follow.

"Following my mother's death, Mrs. Rich begged me many times to make my home with them, saying they did not want me to work, but just be with them, to take charge of the help if they were ill, and to keep them company in their home. After much persuasion, I finally promised that, if they really needed me and sent for me, I would sell out and come. * * * Then Mrs. Rich wrote, urging me to come, and Mr. Rich wrote himself, saying, 'I am sure we can make an arrangement that will be pleasant and profitable for both of us.' Relying upon his promise, I sold out, and came to Iowa City in November. But Mr. Rich made no mention of profit to me. Evidently they expected me to devote myself to them, reading, sewing, etc., but they had no idea of

paying me anything beyond board and room. Mrs. Rich told me that they would leave me some money. * * * In March, I began teaching, with their full consent and approval. * * * As soon as I began teaching, Mrs. Rich wanted me to pay board, in addition to all I was doing for them, and I did buy food amounting to nearly $20 that semester for the table. * * * By her wish I boarded elsewhere one year, but Mr. Rich felt so keenly her unfair treatment of me that he called me to the bank to express his regret. When she became ill, he called me from school, and I did all I could those last weeks. While she was still living, he asked if I would not come back and manage the house, with such help as I wished to hire. I agreed; but later, he was persuaded to go to California. In about three months, he wrote, asking me again to take charge of the house. Again he was persuaded to wait. By December, he wrote to make definite plans for the spring. During my spring recess, I opened the house and put it in the best possible condition before he came back. Since then, I have devoted myself to making it a real home for him. I gave him most of my evenings, besides Saturdays and Sundays. I gave up my own social pleasures almost entirely. Because my teaching took me away during the day, I felt I must not go out much at other times. I read aloud to him a great deal; kept his clothing most carefully; did the household sewing, marketing; and took an interest in the garden,— bought more than half the seeds, plants, etc., in which he took so much pride. I bore fully half the expense on newspapers, and he took much pleasure with mine. * * * My business needed my attention desperately last year, but he said: 'You can't go, that's all, I would rather buy all you have out there than have you gone.' * * * While I was teaching, I did not ask him for pay, lest he might feel that I was using his time for my school. He paid me just $100 a year. The last year, he wanted me to quit teaching, and I consented, if my income would be the same. He consented eagerly; for he said himself that I could have had more elsewhere; so I had $1,200 that year, and $25 additional he gave me in the last month. * * * Mr. Rich said, in regard to my help to him, 'You shall be generously paid.' And when he was talking over arrangements, he prefaced it by saying, 'Of course, there will be something for you when I am gone.' * * *

Giving up my teaching at last and merely keeping house caused further talk. I have been criticized by my relatives, who could not understand why I should think of it. To break up my business to fulfill a rather carelessly given promise, they called quixotic. * * * I had reason to expect some compensation, since Mr. Rich knew that I could command a good salary. * * * Such service cannot be paid for in money; but, having no true heirs, he was in a position to show appreciation. His promise that the arrangement would be pleasant and profitable to both of us has yet to be carried out. * * * Had he given me an equal share with these nephews and nieces to whom he was in no way obligated, I should have felt that he realized the value of my sacrifices. Had he left me even $5,000, I should not have felt these eight years thrown away. * * * I must now take up other work, and the $2,000 he left me in bonds is worth only about 85 per cent of its face, so that I lose much if I convert them into cash. I ask the court, therefore, to allow me an additional sum of $3,000, besides these bonds, as payment for services rendered under promise of generous reward.''

Of this statement it is argued by counsel for appellant that, when the contents of the will were made known to her, and the pittance of $2,000 face value of two United States bonds was all that was left her, she was naturally dazed at the broken promises, etc.; that, at the time the statement was written, or at the time her claim was filed, she did not know of any witnesses who could testify to the contract that had been made with her. Appellant testifies in regard to this:

''At the time I wrote this statement, or at the time my claim was filed, I did not have knowledge of the testimony, that of Mrs. Partridge, Dr. Wheitis, and Mrs. Wheitis, in regard to the original contract. I didn't know I had any witnesses.''

We shall turn now to the testimony of the three witnesses just named. Mrs. Partridge testifies:

''Reside in Iowa City. Knew J. W. Rich well for nearly 30 years. Mrs. Rich was one of my most intimate friends for more than 20 years. For about 15 years, lived just across the street from the Rich home, and after that, I lived at my home on the west side. I have known plaintiff since '96. She lived with Mrs. Rich. Knew her well while she was attending the univer-

sity.   Can't tell the date exactly when she later came to live
with the Riches.   I think she entered the university in '96,—
either entered then or graduated then,—I can't tell exactly.   I
paid no attention to the years, but I think it was in '96 that she
entered, and she took a four years' course.   After she gradu-
ated, she went away to teach.   Don't know where she went.
Saw her after that at Mr. Rich's home.   It was after she went
north.   I saw her several times whenever she came back to Mr.
Rich's.

"Q.   I will ask you whether there was ever any time when
you were present when there was any conversation had between
you and Mr. Rich or between you and the Riches in which Mr.
Rich took part, with reference to securing of the services of
Miss Golden.   A.   Yes, sir, there were times without number;
that is what the gentleman is trying to get at.   Q.   Will you
state when these times were, with reference to Miss Golden's
coming?   A.   When they were trying to get Miss Golden to
come down there, Mrs. Rich often talked with me about, it,—
about her wanting Miss Golden to come.   She wanted Miss
Golden to come and be with her as a daughter; and very many
times she talked it with me before Mr. Rich, and Mr. Rich never
said yea or nay, and never gainsaid it in any way.   That would
show he agreed to it.   So very many times.   You know I lived
right across the street from Mrs. Rich; used to see each other
every day.   All the time she was trying to persuade Miss Golden
to come down, she told me Miss Golden would have to make a
sacrifice with her property; but she had written, she says: 'I
have written her, if she will only come and be to us as a daugh-
ter, and will come and stay with us and see us through, why
then she will be compensated.   I told her the loss she will be to
then will be amply repaid,—made up to her.' ''

Motion to exclude this answer on numerous grounds was sus-
tained.   The ruling was obviously correct.   Question read:

"A.   I can't tell you the dates of any of them; only I know
this was about twenty years ago, nearly.   These statements were
made before, of course, Miss Golden came there to live.   She
lives at the Rich home at the present time.   Q.   Do you know
how long she has lived there?   A.   If you can tell me the time
that Mrs. Rich—I wish Dr. Wheitis was here; he could tell me

when Mrs. Rich had that first hemorrhage.''

Witness then proceeds to volunteer an answer which was struck out.

"Q.   When, with reference to the time you stated she came to the Rich home, were these conversations had between you and Mrs. Rich, and the conversations had between you and Mrs. Rich when Mr. Rich was present, with reference to Miss Golden coming to the Rich home?   A.   Why, long before Miss Golden came.   Let me speak in my own words; then you can make all the objections you please, sir.   But long before she came to live with the Riches really and truly as their daughter, according to my understanding, Mrs. Rich and I had many conversations in regard to her.

"Messer:   If the court please—

"A.   Please wait; let me tell my story.

"Messer:   Move to strike the statements with reference to Miss Golden coming, etc.   Sustained.

"Q.   Mrs. Partridge, do you remember the incident, without fixing the date, when you had this conversation with Mrs. Rich with reference to Miss Golden coming?   (Objection.   Overruled.)   A.   Thank you, Mr. Otto.   Will you please state that again?   I am afraid they will object, incompetent, etc.   I won't be able to answer anyway.   (Question read.)   A.   Why, I remember when she came there to live after she came from up in the north that time.   I remember that, but I don't see what that has to do with this case.   Q.   Mrs. Partridge, state what conversation you had with Mrs. Rich prior to that time, with reference to Miss Golden coming.   (Objections, among which were that it was assuming.   Overruled.)   A.   I am not assuming at all.   I am stating what I know and what Mrs. Rich told me and what Mrs. Rich in his presence has told me.   Now, if you will let me talk about three minutes, I will be thankful.   Why, you interrupt me so often I don't know what I am going to say next. (Question read.)   A.   This was before Miss Golden came there to live with them, we had this conversation; and she was trying to get Miss Golden to come there, she told me, not to be a servant,—to come there as their daughter; and when she was through, if she would stay with them and take care of them, when they were through with their life, then she was to have

what was left, as her own. Now that is all I have to say about it. She was anxious for Miss Golden to come, and was delighted and pleased when Miss Golden came; so was Mr. Rich.''

Long objection.

''Court: Sustained, if it appears from the answer that there was any conversation given by Mrs. Rich in the absence of Mr. Rich.

''Q. Were these conversations you have spoke of, and which you related here, in the presence of Mr. Rich, or in his absence? A. Several times they were in the presence of Mr. Rich. An old Norwegian proverb which says, if nothing is said, 'yes' is supposed to be the answer. (Motion to strike all after the answer 'several times,' etc. Sustained.)''

We have set out, as briefly as it is possible to do so, the examination to this point of this witness in regard to conversations prior to the time plaintiff came to the Rich home. Witness was then asked as to whether she had conversations after plaintiff came. Witness said she had conversations with them in regard to that after plaintiff came.

''Q. When was that? A. I couldn't give you the date, but it was after she came. Dates are my poor point; I can't give only about five. I could tell when America was discovered, and a few other things, is all I could give.''

Some volunteer statements by the witness as to conversations after, were stricken. The witness finally testified:

''Q. Will you tell the jury, if you remember, what was said by Mrs. Rich to you in Mr. Rich's presence, or by Mr. Rich to you, with reference to Miss Golden making her home at the Rich home after she came? A. Well, I don't see any reason of repeating what I have already said. Mrs. Rich, not only before but after Miss Golden came there to make it her home, gentlemen of the jury, she told me she had come to live with her as a daughter; not as a servant, but as a daughter. She was very happy and feeling glad to think that arrangement had been made; that a long time she had been trying to persuade Miss Golden, and in the end she had. She said this same thing before Mr. Rich. I never on any special occasion talked to Mr. Rich in regard to it, but I talked with them both together in regard to Miss Golden coming there and living with them, and that she

was to come there and be with them as their daughter. I am telling you just word for word almost what Mrs. Rich said to me. Q. What, if anything, was said with reference to their arrangement with Miss Golden for payment for her services while she was living there with them? A. As far as payment was concerned, nothing—Mrs. Rich never said anything to me about her paying her anything; only that, in the end, she was to have what was left. If I could say two or three words here,—''

Cross-examination.

"Q. How old are you? A. 190. Q. 190 years old? A. Yes, sir; you asked me how old I am, which is irrelevant again. Q. Do you claim to be 190 years old? A. I claim to be 83; and my mind is with me, where it belongs, too, I want you to understand."

Witness was then interrogated as to dates when plaintiff came, etc., the answers to which were very indefinite. Witness was recalled, and asked as to conversations with Mrs. Rich in her husband's presence, with reference to sacrifices made by plaintiff. Witness says they were talking one day about the sacrifices plaintiff had made, and Mrs. Rich made this remark: "Well, you will be amply repaid for all the sacrifices you have made, in the future."

"She says, 'in the future.' I am sure Mr. Rich was there; can't say whether Miss Golden was or not."

Says she talked with counsel for plaintiff after she left the stand.

It will be seen from the foregoing that there is very little in the testimony of this witness, if, indeed, there is anything at all, tending to establish a contract between plaintiff and Mr. Rich. The memory of the witness was evidently not good; she was somewhat excited, and stated her conclusions. The questions were, many of them, leading.

Dr. Wheitis says:

"Physician. Knew J. W. Rich and his wife and plaintiff thirty years. Had conversations with Mr. Rich at various times. Used to drop in the office and tell me what he was going to do. They were both getting feeble. He talked about getting somebody to come and take care of them, and he mentioned particu-

larly Miss Golden, someone they knew, he thought would be the proper individual to take care of them. He said he wanted to get somebody to come and take care of them as long as Mr. Rich lived and as long as she lived, and what he had would be theirs when they got through. He mentioned specifically Miss Golden as the individual he had in mind. After that conversation, I think Miss Golden came to their house.

"Q. What, if anything, did she do, that you observed? (Objection as indefinite, and no time fixed.)

"Court: I think the time should be fixed.

"Q. Do you recall when Miss Golden came there? A. I don't. About ten years, I should judge,—I don't know. During Mr. Rich's illness, plaintiff seemed to be the individual that was caring for him."

Witness describes what she did about giving directions as to administering medicines the witness prescribed, and says that she was a competent nurse; that she was looking after his meals, waiting on him, etc.; that he observed the care plaintiff gave Mr. Rich during the last two years of his life, or the last year. Witness was asked as to the value of the services rendered by plaintiff for the last year, and he answered that he did not know; that trained nurses were getting $5.00 to $8.00 or $9.00 a day.

### Cross-examination.

"Q. You related a conversation which you say he told you sometime when he came into the office. Can you fix the date of that conversation? A. No; it was the year preceding the time Miss. Golden came there,—something like ten or eleven years ago. Can't give the date. I do not know how many times Miss Golden was at the Rich home."

Mrs. Wheitis testifies: Wife of Dr. Wheitis; knew Mr. and Mrs. Rich a long time; frequently at their house; remember a conversation with Mr. and Mrs. Rich in regard to their having written to Miss Golden. Miss Golden was some place in North Dakota on a ranch.

"Q. Now you may tell the jury the substance, as you remember, of the conversation, what was said by Mrs. Rich or Mr. Rich, or either of them, in the presence of the other. A. I remember that Mrs. Rich said to me, in the presence of Mr.

Rich, that she had written to Miss Golden that, if she would leave her home in North Dakota and come down and live with them and take care of them for their lifetime, that what they had when they were through with it should belong to her. Q. State whether, after that conversation, you had a conversation with her, or she told you in the presence of Mr. Rich as to whether Miss Golden was going to accept the offer or not. (Objection, leading and suggestive.) A. I was at Riches' after they had written, and they said Miss Golden was coming. Mrs. Rich, in the presence of Mr. Rich, said Miss Golden was coming to live with them. Q. Anything said on either of these occasions in regard to the friendship they had for plaintiff? A. Mrs. Rich, in the presence of Mr. Rich, said that Miss Golden's mother was her dearest friend, and that she felt Miss Golden was like a daughter to her. In the last few years of his life, Mr. Rich said he couldn't be cared for in a better way than he was cared for."

Cross-examination.

"I do not know how long I have known Miss Golden; maybe fifteen or twenty years,—a long time. Remember meeting her at Riches' when she was visiting there. I remember just being introduced to her; I didn't know her well. Don't know how long that has been. A long time ago I met her first. Never saw her any place except in Iowa City; never saw her in North Dakota. I went to California August 23, 1919, and returned August 15, 1920. Was at the Rich home after Mrs. Rich died,—the last time in May, before I left Iowa City in June, to go to the lake, in 1919. I cannot give the date of the first conversation I had with Mrs. Rich; it was before Miss Golden came. I cannot give approximately the year the conversation occurred, nor the second."

Plaintiff testifies as to the dates of the different times she was at the Rich home; the times and places where she taught school; the physical condition of deceased at different times; who was in the Rich home when she was there; and so on.

One of the nieces of deceased testified to visiting in the Rich home in 1915, 1918, and 1920, and states a conversation with plaintiff as to the conditions under which she was staying there; that plaintiff said she was there as housekeeper, teaching

school, receiving $100 for the long vacation of the school year, and from the time she quit teaching, she received $100 a month.

"The last conversation was in 1920; it was not in March, 1915. I don't know whether it was in June, 1916; Miss Golden said she was general housekeeper,—superintendent of affairs. I don't know that what I said about her receiving $100 a month was the language of Miss Golden; can't give the language she used in any of these conversations."

It is not claimed that this is all the evidence introduced on the trial. That would not be expected. It is the substance. It is doubtless true that the Riches, particularly Mrs. Rich, desired

1. WILLS: con-
tract to will:
evidence: suf-
ficiency.

plaintiff to come into the home under some arrangement. There are different versions, or theories, as to what arrangement might be made as to plaintiff's remuneration. The most that can be claimed for the testimony as tending to show a contract between plaintiff and J. W. Rich for the entire estate is that, a long time ago, Mrs. Rich, in the presence of her husband, made certain statements to two or three witnesses as to something which was going to be done in the future, and that thereafter plaintiff came from the north, and went into the home for a time, and at different times, under some arrangement. It does not appear that the husband was in a position to hear, or that he did hear the alleged conversations. It does not appear that plaintiff's coming to the home was referable to the alleged conversations, or that their minds met on any one definite proposition. She was not present at any of the alleged conversations. None of the witnesses claim that they communicated the same to the plaintiff. Plaintiff does not herself, in her statement, claim that she came to the home under such an alleged contract. Even though she did not at that time know of witnesses by whom she could prove such statements, she knew the fact, if it was a fact. It was a very important matter to her. Had there been any letters competently bearing upon the subject, it would have been most natural that they should be preserved. Plaintiff's after conduct is inconsistent with such a contract. It is true that declarations or admissions deliberately made, clearly remembered, and correctly given, are often satisfactory evidence. But the human mind and memory are subject to much imperfection; and such

declarations, made years before, not clearly remembered or accurately stated, should be cautiously received. *Martin v. Town of Algona,* 40 Iowa 390, 392; *State v. Jackson,* 156 Iowa 588, 596. Some of the cases put it this way, and approve instructions to the effect that the testimony of admissions or loose conversations should be cautiously received, if received at all. They are incapable of contradiction. They are seldom anything more than the vague expressions of a witness of what he thinks he has heard another say, stated in his own language, without the qualifications or restrictions, the tone, manner, or circumstances, which attended their original expression. In this case, we think the alleged declarations fall within this class. The temptation to set up claims against the estates of decedents where there are no lineal heirs, is very great, and the testimony should be closely scrutinized. Such claims are not necessarily established because the evidence is not denied. *Holmes v. Connable,* 111 Iowa 298, 301; *Ross v. Ross,* 148 Iowa 729, 733; *Snyder v. Guthrie,* 193 Iowa 624, 630. Not all claims are not meritorious. The evidence may be such as to warrant a finding for claimant. *Snyder v. Guthrie, supra.* Doubtless some just claims may not be established because of "the dead man's statute." Appellee concedes that such a claim as plaintiff makes may be established if the evidence is sufficient. We have held that the evidence must be clear, satisfactory, and convincing, and that the acts relied upon to constitute performance should be equally clear, and referable exclusively to the contract. *Stennett v. Stennett,* 174 Iowa 431, 435; *Hart v. Hart,* 181 Iowa 527, 535; *Lynch v. Coolahan,* 177 Iowa 179. We have said that the evidence of witnesses indicative of an unexecuted purpose on the part of deceased to make a future disposition of the property lends little countenance to the idea that he had already made such a definite and specific contract to convey as to prevent his changing his mind and refusing to carry out the arrangement if he saw fit. *Boeck v. Milke,* 141 Iowa 713; *Stennett v. Stennett, supra,* at 435. Entire estates may not be transferred by such evidence as we have here. There was not enough to take the case to the jury on that point, and the trial court properly withdrew such issue from the jury.

2. The foregoing disposes of the really vital point in the

case. Other questions raised require but brief notice. After plaintiff had rested, and defendant's motion to withdraw Count 2 had been sustained, and defendant's motion to direct a verdict for defendant as to Count 1 overruled, plaintiff, by her counsel, asked leave to reopen the case and introduce evidence as to the value of plaintiff's services for other years prior to the last year; counsel stating, "I did not realize that the question put to Dr. Wheitis was only for the last year." It was claimed as an oversight. The request was denied. The claim as originally filed, and the amendment thereto, asked to recover for services for years other than the last. The services rendered during said years were described by the witnesses. Under these circumstances, and under the entire record, this was a matter within the discretion of the trial court. We think there was no abuse of discretion which would warrant this court in reversing the case on that ground.

2. TRIAL: reception of evidence: reopening case.

3. It is assigned as error that the court erred in admitting in evidence, over plaintiff's objection, Exhibit No. 18. This was a short written note by deceased, directed to the administrator, and was produced and delivered to Korab by the plaintiff. It was a request that the housekeeper in charge be permitted to continue in the occupation of the home, and for a liberal allowance to the housekeeper for the care of the property after his death. This was offered in connection with checks paid to plaintiff after the death of Mr. Rich, as testified to by Korab, without objection, and as before set out. She had asked Korab to continue paying her a salary after the death, because of Exhibit 18. The substance of the exhibit was already in evidence, and without objection. We are unable to see any prejudice that could result to plaintiff from this, even if it be conceded that the paper was not admissible.

3. APPEAL AND ERROR: harmless error: duplicate reception of evidence.

4. It is next claimed that the court erred in admitting in evidence an amendment to Count 2 of plaintiff's claim, and evidence in explanation thereof. We assume that this was offered by defendant for the purpose of showing the contradiction in the claims. However this may be, Count 2 is now out of the case; so that no prejudice could result.

5. It is next claimed that the court erred in the instructions in statement of issues upon which there is no evidence: namely, that defendant alleges that any services rendered by claimant to said Rich have been fully paid for by him in his lifetime. The defendant did so plead, and there was evidence that payments had been made.

6. It is thought that the court erred in its statement of the issues to the jury, in submitting an alleged issue upon which no evidence was given: namely, that all other services rendered by plaintiff were rendered without expectation or promise of compensation, and were a gratuity on her part, etc. The court did not state it just as counsel state it in the assignment of errors. The court was simply stating the issues, and what was contained in the defendant's answer. Defendant did therein plead as the court stated. It is thought that Instruction 6 refers to the same matter, and instructs the jury in reference to such a claim. The court stated that this question and the question of payment were questions for the jury to determine; that the burden was not upon the plaintiff to show that her claim had not been fully paid; but that, if she has shown that she rendered the services, or any of them, for deceased, she would be entitled to recover the reasonable value, in the absence of an express agreement as to amount; but that she could not recover for what she has already been paid. We think appellant has no ground for complaint at this point.

Some other questions of minor importance are argued, but in our opinion they are not at all controlling. No prejudicial error appears. The judgment is—*Affirmed.*

ARTHUR, C. J., and EVANS and FAVILLE, JJ., concur.