GESKE HELMERS, Appellant, v. CHRISTIAN BRAND et al., Appellants; JERRY M. KUPER, Appellee.

**FRAUDS, STATUTE OF:** Exceptions—Parol Transfer of Land. Clear and unequivocal testimony *is an indispensable requisite,* not only to the *establishment,* but to the *performance,* of an oral contract between a party deceased and another for the transfer of land in return for services. (See Book of Anno., Vol I, Sec. 11286, Anno. 12 *et seq.*)

Headnote 1: 36 Cyc. pp. 689, 691.

*Appeal from Grundy District Court.*—GEORGE W. WOOD, Judge.

APRIL 5, 1927.

Action for partition of real estate. The contest arose on a petition of intervention in behalf of one Jerry Kuper, who appeared by his next friend, and who subsequently filed a cross-petition by a guardian and claimed title to the real estate in question by virtue of an oral contract claimed to have been entered into between the decedent and the father of said Jerry Kuper.—*Reversed.*

*Kelleher & Mitchell* and *Sullivan, McMahon & Linnan,* for appellants.

*Pickett, Swisher & Farwell,* for appellee.

FAVILLE, J.—One Ralph Becker was the owner of the real estate in question, which consists of 160 acres of land in Grundy County and two lots in Ackley, Iowa. He also owned about $5,000 worth of personal property. Becker was never married. He died on or about June 17, 1923, at about the age of 68 years. He was survived by a sister, appellant in this action, and by nephews and nieces, children of a sister who predeceased him, who are also appellants. Becker's parents died in 1906. He inherited a portion of the real estate in question, and purchased the balance. He lived alone in a house on the farm, and rented out most of the land. His heirs live in Kossuth County. The visits between Becker and his sister and the children of his deceased sister were infrequent. The Kuper family lived about three quarters of a mile from the home of Becker. The appellee, Jerry Kuper, is the son of Menno Kuper, and lived at home. The claim of the said Jerry to the property of Becker, briefly stated, is that, in the month of May in the year 1919 or 1920, an oral contract was entered into between Becker and Menno Kuper, whereby it was agreed that Jerry, who was, at the time, 11 or 12 years of age, should perform services for Becker, in taking care of him if he needed help, and in consideration therefor should receive all of Becker's property at his death.

Many questions of law are argued by appellants. The cause being triable *de novo,* we prefer to rest our conclusion on the facts of the case, without passing on the legal questions urged.

I. This action is in equity, and the representative of Jerry must establish his contention that a contract was made, as claimed, by clear, convincing, and satisfactory proof. The authorities on this question are collated in the case of *In re Estate of Dolmage,* 204 Iowa ——, to which specific reference is made on this point. We shall not attempt to review all of the evidence pro and con, bearing on the question of the formation of the contract.

There is a large amount of evidence in the record tending to show that Becker was eccentric and peculiar. He made at-

tempts to construct impossible and unworkable inventions. He did odd and unusual things. He largely lived the life of a recluse. The evidence, taken as a whole, however, does not impeach his mental capacity to transact business, or establish a want of ability to enter into a valid contract of the character of the contract in question; so that, in its last analysis, the question is one of fact as to whether or not Becker entered into an oral contract with the father of Jerry, as claimed.

The witness Menno testified respecting the formation of the contract, as follows:

"Q. What was the first thing that you talked about? A. The first thing he said, it was nice weather, and this and that, and asked him how he felt, and he explained that to me, and he was talking more about planting, corn, and this and that, so at last he came to the talk about that he wasn't feeling so good, and that I should send Jerry over, and look after him, in case he wasn't feeling good, and so, taking care of him if he needs something. Q. And what did you say? A. I told him that was all right; I would send him over; I will do it. Q. Anything else? A. Well, yes; then he said, 'I will give Jerry my property, after I am dead, Jerry gets my property.' * * * Q. Let me finish asking you about this conversation. You say that he said he wasn't feeling so well, and that you should send Jerry over to look after him, when he wasn't feeling well, and that he would give Jerry his property? A. Yes, sir. Q. That Jerry would get his property when he was dead? A. Yes, sir. * * * Q. What else was said between you and Mr. Becker in this conversation? What was your reply? A. I told him I will do that, and whenever he needs some help; and then he told us about the sign on the door, on the barn, whenever he gets up in the morning, and the evening we could see his light."

The witness Jerry's testimony is as follows:

"Well, Becker says, 'Menno, if you will send Jerry over to look after me whenever I need anything, and look after my stock, then I will give Jerry all of my property; that is, that he will get it after I am dead.' Then my father says, 'Yes, I will do that.' "

Again, this witness said:

"Why, first they talked of the weather, it was nice weather, and that was good corn weather, and that it was warm weather,

and papa asked him how he was feeling, and then Becker said that his chest hurt here [pointing], and then Becker says, 'Menno, will you send Jerry over to look after me, whenever I need anything, and to look after my stock, and then I will give Jerry all of my property after I am dead, so he will get it after I am dead;' and then my father says, 'Yes, I will do that.'"

As a corroborative witness, the appellee produced one Hayunga, who testified to a conversation with Becker at a funeral, in March, 1923. Hayunga spoke to Becker about having a telephone in his house, and Becker said:

"'Boys, I got it good,—better than you think; I can eat and drink and do what I please; I am alone.' And then he said about the phone, 'I got the best phone you could ever invent.' We said, 'Who is that,' and, 'Well,' he said, 'it is the Kuper boy; he tends me.' He said, 'Jerry Kuper, he tends me.' He had certain signs he told us about,—I forget about what kind,—with the door or windmill, that, whenever the thing was that way [indicating], it was all right, and if that way, then he had to come, and he said, 'If that wasn't fixed the way it ought to be, the boy was there.' I was visiting him, and quite often he told us: 'That boy is worth to me the whole world, he tending me. Whenever there is something wrong, he jumps on his pony, and down he comes,—that is the way,—and I think I give him the whole farm, because, when I am needing somebody, he is there, and nobody tends to me but he.' That is the way he told us, and this Willems said, 'Well, Ralph, that boy earns something,' and I said, 'He earns something, that is true, give him something now, you are able to do it.' 'Well,' he said, 'I will,' and I guess that was all he said. That is just the words he told us, so close as I can get them."

Another witness testified that he was present at the same conversation testified to by Hayunga, and testified:

"Then Becker spoke up, and says, 'Well, we have a little Kuper there,' and the way he made his remark, he wanted to give all his property to him. 'Just as soon as,' he says, 'as he don't see my light, the little Kuper is there on the broncho,' he says, 'and looks after me.' That is they had mostly between themselves; I only be there and heard it and talked with them. Q. Did he say anything about giving Jerry all his property for looking after him? A. He made that remark, and said,

—the way he made his impression,—that he was going to give it all to him,—the way I understood it.  Q. To who?  A. To the Kuper boy,—to Jerry Kuper.''

Another witness testified:

''I cannot remember how long it was before Mr. Becker died that we had this conversation. It might have been two or three years, and then I was there again, and he said to me, 'I believe I will give him the whole smear,'—to this Jerry Kuper. That was after the first time. It might have been a year and a half before he died. I didn't have any other talk with Ralph Becker. He told me a good deal about this little Kuper boy; that he was an awful handy boy, and was a good-hearted boy; and that he was so awful willing to come over and look after him.''

Appellants lay stress upon the fact that Menno testified, upon cross-examination, as follows:

''Q. Had Becker, up to that time, ever asked you to send Jerry over, up to that date,—had Becker, before that day, ever asked Jerry to come over,—I mean, asked you to have Jerry come over?  A. No, he never asked me before; he said he should come over sometime; that is what he said.  Q. Before that?  A. Yes, sir. He had said that before. We went over there. He had been talking about that (to bring Jerry over or send Jerry over before that day).''

Menno testified that he and Jerry kept the matter to themselves; that he told no one except a man named Christian, who was dead at the time of the trial. Significance is also attached to the fact that, after Becker's death, the original claim of Kuper was that the subject of the contract was 80 acres of Becker's land, and not the whole estate. One Arends was the administrator of the estate of Becker. No claim was ever made to Arends that Jerry was to have the Becker property. Menno made a claim against the administrator for services rendered in connection with the estate. Menno bought some of the Becker property at the administrator's sale. He also testified:

''I cannot say whether it was a good contract or not. I thought it was all right, as far as that goes. It was yet by word. I couldn't say that I thought that would give Jerry the property.  Q. Is this what you thought, Kuper: that 'Ralph Becker likes Jerry, and I think is going to make a will and give Jerry

the property?' A. Yes, sir. Q. Is that the way you thought it, always,—wasn't it? A. Yes, sir.''

After Becker's death, a written instrument was found among his belongings in his house. It was in the handwriting of Becker. A photographic copy of said instrument is as follows:

It appears that, in 1920 or 1921, a banker living at Austinville, not far distant from Becker's place, was consulted by Becker in regard to making a will, and at said time the banker was told by Becker that he had not made up his mind yet to whom he would give his property, and to leave the name of the

beneficiary blank. He then made out a short form of will in typewriting, and delivered the same to Becker, and told him that it would not be any good unless it was witnessed, and that he would have to put in the name of the beneficiary and have it witnessed. It is contended that Becker copied this typewritten form.

It is contended in behalf of the appellee that the written instrument in the form of an unwitnessed will is corroborative of appellee's contention of the formation of the contract. It appears to be in the handwriting of Becker, and perhaps is a copy made from the typewritten form that was furnished him by the banker. He was expressly informed by the banker, however, that it could have no validity as a will unless it was witnessed. Appellant contends that the instrument does not name the appellee at all, but may as readily be read Jenny M. Kuper as Jerry M. Kuper. The record shows that the appellee's name is Jerry *Benjamin* Kuper.

We have made no attempt whatever to set out all of the evidence, but merely sketch in outline its general character. Obviously, the appellants suffered under the handicap of being unable to in any way meet the testimony of Menno and Jerry regarding the alleged conversation with Becker, by any direct testimony. The conduct of Menno after the alleged contract is so inconsistent with a claim that a valid contract was entered into at the time, as to largely weaken the force of his testimony with respect to the formation of such a contract. The evidence tends to show that he never disclosed any such alleged contract, even to the other members of his family, until a considerable time after Becker's death. Knowing, if his claim was true, that Jerry was entitled to all of the property of Becker, he attended the administrator's sale, and purchased some of the Becker property. He filed with the administrator a claim for services in connection with the care of the Becker property. During all of this, he made no hint of a claim of any such alleged contract with Becker in behalf of Jerry. The record which we have set out speaks for itself. We do not regard the testimony of the witnesses who talked with Becker as being sufficiently corroborative to establish the verity of the contract by that degree of proof which the law requires. It is a salutary rule of equity that requires that the proof of a contract of the kind involved

in this action must be established by clear, convincing, and satisfactory evidence, before a court will decree a specific performance thereof. We are persuaded, from a careful examination of the entire record, that the appellee has failed to establish the contract pleaded by that degree of clear, convincing, and satisfactory evidence that is required by a court of equity in cases of this character.

In *Holmes v. Connable,* 111 Iowa 298, we said:

"It will not do, as plaintiff's counsel seem to think proper, to hold that, because a certain number of witnesses have testified to the making of the contract, and none have been called to deny it, plaintiff's case is established. The lips of the only two witnesses who could deny it are forever closed. The only person who could controvert the admissions alleged to have been made is the dead man against whose estate this claim is produced. There is no defense that can be made, save as it may be found in the improbability of the stories of the plaintiff's witnesses, when tested by comparison with other evidence in the case, or the ordinary rules of human conduct under similar circumstances."

In said case we quoted from the Supreme Court of Illinois in *Wallace v. Rappleye,* 103 Ill. 229, as follows:

" 'It is incumbent on the court to look upon such evidence with great jealousy, and to weigh it in the most scrupulous manner, to see what is the character and position of the witnesses generally, and whether they are corroborated to such an extent as to secure confidence that they are telling the truth.' "

We hold that the evidence does not clearly establish the contract under which appellee claims the property of the decedent.

II. An even more difficult situation confronts the appellee with regard to the question of alleged performance of the claimed contract in question. The rule with regard to the proof necessary to establish performance of a contract of this kind on the part of the claimant in an action in equity is of the same character as the degree of proof required to establish the contract itself. In *Stennett v. Stennett,* 174 Iowa 431, we said:

"The rule is well settled that, to establish such contract, the proof must be clear, unequivocal, and definite, and that the acts said to constitute performance should be equally clear and definite, and referable exclusively to said contract. *Chew v. Holt,*

111 Iowa 362; *Bevington v. Bevington,* 133 Iowa 351; *Boeck v. Milke,* 141 Iowa 713.''

See, also, *In re Estate of Bremer v. Haag,* 151 Iowa 449.

With regard to the alleged performance of the contract by the rendition of services by Jerry which were in any way referable to the contract, the evidence shows that, in a general way, the Kuper family performed what may properly · be termed ''neighborly services'' for Becker. Menno, or some other member of the family, took milk to Becker's place a few times, but the number of times is very indefinite. It appears that sometimes the family, or some member, brought bread from town to Becker, but Becker always paid for it. This was ''not very . often.'' One time when Menno was there with Jerry, he testified, Jerry did not do anything except put some fuel in the stove. Jerry testified that he had been down at Becker's place a number of times,—not more than once a month,—and then said: ''Some months I was there more than once. I had been there on Sundays. He had been up to my father's place.'' The father testified that, so far as he knew, Jerry never ate a meal at Becker's; never did any cooking or washing or cleaning of any kind in the house. The evidence also showed that, before the talk in the cornfield, the Kuper family had performed services for Becker by taking milk and meat to him and visiting him. Menno testified that he was not doing these things for the purpose of earning the farm, and did not expect to earn the farm in that way, but did them for kindness, and to be neighborly.

From a careful examination of the entire record we are disposed to hold that the appellee has failed to establish, by the clear, satisfactory, and convincing proof that is required in cases of this kind, that any services were performed under the alleged contract that were in any way referable to the contract. Jerry was, at the time, a lad of eleven or twelve years of age. Undoubtedly, he was frequently at Becker's place, and the family performed neighborly services for Becker, the same as they had done previously. Other neighbors did much the same. There is no claim that Jerry or any member of the Kuper family changed their relationship to Becker after the making of the alleged contract. The conduct in regard to the Becker property after his death is entirely inconsistent with the claim of the existence of any such contract or its performance on the part of

the appellee. We think it is a salutary rule that requires clear, substantial, and convincing proof, not only of the existence of the claimed contract, in a case of this kind, but of the performance of the same in accordance with its obvious purpose and intent. We are convinced that the appellee has failed to establish the contract claimed by the degree of proof that is required in a case of this character, and has failed to establish a performance of the claimed contract by services thereunder which were referable to the contract. Upon the entire record, we are constrained to differ from the conclusion of the trial court, and to hold that the appellee's cross-petition should have been dismissed.

It follows that the decree of the trial court must be, and it is,—*Reversed.*

EVANS, C. J., and STEVENS, DE GRAFF, VERMILION, and ALBERT, JJ., concur.